BAYRIDGE ASSOCIATES LIMITED
PARTNERSHIP,
formerly known as A & G Builders, Ltd.

*v.*

DEPARTMENT OF REVENUE

(TC 3271)

and

DURHAM PARK LIMITED PARTNERSHIP

*v.*

DEPARTMENT OF REVENUE

(TC 3272)

David P. Weiner and Anne Meagher, Samuels, Yoelin, Weiner, Kantor & Seymour, Portland, represented plaintiff.

James J. McLaughlin, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiff rendered February 3, 1994.

## CARL N. BYERS, Judge.

Plaintiffs appeal the January 1, 1990, assessed value of two apartment projects qualifying under IRC § 42 as low-income housing. Plaintiffs claim that the restrictions on low-income housing are "governmental restrictions" within the meaning of ORS 308.205(2). Defendant disagrees and contends that, even if they are governmental restrictions, the associated income tax benefits (credits) received in exchange must be taken into account in valuing the properties.

### FACTS

The Durham Park apartment complex, which was completed in 1989, is located at the corner of Southwest 108th and Southwest Durham Road in Tigard. The project contains 224 living units in 28 8-plex buildings. The 8-plexes are all 3-story buildings. One-story buildings house the garages, offices and recreation area. Durham Park was conceived, constructed and is operated as a low-income housing project. The Bayridge complex is similar to Durham Park, although it was only 60-percent complete as of the assessment date.

Bayridge Associates did not prepare an appraisal for this appeal, but rather introduced evidence of rental income, status as a low-income housing project, and degree of completion as of the assessment date.

Under IRC § 42, the owner of an apartment complex may qualify for substantial income tax credits. However, those credits have a funding limit as well as a dollar limit. Congress imposed a limit of $1.25 per capita on the amount of credit allowed to any one state.[1] Under the federal law, states are charged with the responsibility of allocating the

---

[1] For example, in 1990, Oregon was limited to $2,643,750.

income tax credits made available to its citizens. The Oregon Housing Agency developed a plan to allocate the low-income housing tax credits made available to Oregon.

In order to receive an allocation of income tax credits under IRC § 42, the Oregon property owner must:

"Agree to rent, or hold available for occupancy, for 15 years at least 20% of the dwelling as Rent Restricted Units for low-income tenants whose incomes are 50% or less of area median gross income adjusted for family size, or at least 40% of the dwelling as Rent Restricted Units for low-income tenants whose incomes are 60% or less of area median gross income adjusted for family size."

The laws governing income tax credits and low-income housing are complex. While it is not necessary to address all the details of the program, it is worth noting that: (1) the credit is claimed in equal annual amounts over a 10-year period, and (2) the credits may be sold to other tax-payers. In this case, Durham Park was entitled to receive $8,163,100 total credits, or $816,310 per year for 10 years, and Bayridge was entitled to receive $9,145,270 total credits, or $914,527 per year for 10 years. Durham Park sold its credits for a total of $4,100,000, or approximately 50 cents on the dollar, and Bayridge sold its credits for a total of $4,455,000 or approximately 49 cents on the dollar.

## ISSUES

The two issues raised by this appeal are:

(1) Do the low-income housing restrictions voluntarily placed on the property constitute "governmental restrictions" under ORS 308.205(2)?

(2) If the restrictions are governmental restrictions, must the associated income tax credits be taken into consideration in determining the value of the property?

## GOVERNMENTAL RESTRICTIONS

ORS 308.232 requires all property to be assessed at 100 percent of its true cash value. True cash value is defined by ORS 308.205 as "the market value" of the property. (1989 Replacement Part.)

The question raised by plaintiffs' appeal is whether the typical buyer and seller would value the property as low-income housing or as a property which could charge market rents. Plaintiffs rely on ORS 308.205(2) which provides:

"If the property is subject to governmental restriction as to use on the assessment date under applicable law or regulation, true cash value shall not be based upon sales that reflect for the property a market value that the property would have if the use of the property were not subject to the restriction unless adjustments in value are made reflecting the effect of the restrictions." (1989 Replacement Part.)

The legislative intent in enacting this section is not clear. The law was enacted in 1977 as part of Senate Bill 827 (Or Laws 1977, ch 423, § 2). The purpose of Senate Bill 827 was to compensate small property owners for loss of value due to "down" zoning. However, that proposal was modified and the law as enacted provides only a partial exemption from taxation. *See* ORS 308.341.

■    The statute adds nothing to the traditional approach to market value. The fundamental concept of highest and best use limits the market value of a property to that use which is "legally permissible." Market value, by definition, will consider governmental restrictions imposed on property. In short, the law is simply affirming that comparable sales used to assess property must reflect or be adjusted for governmental restrictions.[2]

■    Although the governmental restrictions in question are not zoning restrictions, they have a similar effect. That is, the restrictions regulate use of the property by limiting the rent that can be charged. This necessarily reduces the income and limits market value. Similar restrictions are found in rent control ordinances and some zoning ordinances which permit specific commercial uses but not others. These restrictions limit the financial benefits that can be derived

---

[2] The same basic concept is found in ORS 308.235(1) which provides:

"Taxable real property shall be assessed by a method which takes into consideration:

"(a) The applicable land use plans, including current zoning and other governmental land use restrictions; * * *."

from property and therefore limit the property's market value.

■      The fact that governmental restrictions are voluntarily incurred by an owner in exchange for income tax benefits is irrelevant. The statute is not limited to involuntarily incurred governmental restrictions. Many restrictions on property, including zoning restrictions, are sought and obtained at the request of the property owner. This court has previously held that where a landowner voluntarily grants a scenic easement to government, the land in the hands of the owner may have no real market value. *Marchel v. Dept. of Rev.*, 9 OTR 317 (1983). Also, where an owner voluntarily imposes "open space limitations" on property, it may result in a zero taxable value. *Tualatin Development v. Dept. of Rev.*, 256 Or 323, 473 P2d 660 (1970).

It is important to note that the restrictions here are not imposed by IRC § 42. That law merely sets forth the requirements to obtain the tax credits. While the property owner must limit the rent to obtain the tax credits, there is no "governmental" restriction on the property. The restriction on the property arises as a condition imposed by the state for receiving the allocation. The owner must specifically agree to limit the rental fees and this agreement is binding on any subsequent owners. The state's allocation document specifically provides:

> "This Carryover Allocation is binding upon the Oregon Housing Agency, the owner, and all successors in interest to the owner as owners of the project, * * *."

■      Generally, the entire value of property is assessed to the holder of legal title without regard to other interests. *See First National Bank v. Marion Co.*, 169 Or 595, 612, 130 P2d 9 (1942), and *Swan Lake Mldg. Co. v. Dept. of Rev.*, 257 Or 622, 625, 478 P2d 393, *reh'g denied* 257 Or 622, 480 P2d 713 (1971). However, there are two exceptions: (1) easements appurtenant, which shift value from one tax lot to another, and (2) publicly held interests. Taxes are imposed on private property as a means of sharing the expense of public services. Publicly owned property is not taxed unless used for private purposes. Generally, property is taxed only to the extent of the value held for private benefit. It would constitute a form of double taxation to tax a private owner on

interests held for public benefit. See, for example, *Parkside Plaza Apartments v. Dept. of Rev.*, 10 OTR 132, 135 (1985), recognizing the effect of urban renewal restrictions on the value of property.

There is no question low-income housing benefits the public.[3] To the extent that low-income housing restrictions diminish the value of the property, they reduce its taxable value.

## INCOME TAX CREDITS

Defendant contends the assessed value of the property must take into account the income tax credits received by the owner. Income tax credits are unquestionably part of the stream of benefits to be received from property. However, plaintiffs assert that the tax credits are merely a means of financing the projects. That is, without the credits, plaintiffs would have been unable to obtain financing for the full amount required to construct the projects.

■ Under established appraisal principles, market value captures all benefits flowing from property. However, an underlying assumption of market value is that the market will only pay for those benefits it will receive. If tax benefits are limited to the first owner or are recaptured when a property is transferred, such benefits will not enter into market considerations.

Ad valorem taxation is grounded on the bedrock of uniformity. The primary reason for using value in exchange

---

[3] ORS 456.550 provides:

"(1) There exists in this state a seriously inadequate supply of and a pressing need for safe and sanitary dwelling accommodations within the financial means of persons and families of lower income, including but not limited to persons and families displaced by the clearing of slums and blighted areas or by other public programs;

"(2) Private lending institutions have been and will continue to be unable to provide necessary financial support for lower income housing and the resulting shortage of financing has been in whole or in part responsible for the shortage of lower income housing;

"(3) It is a valid public purpose to provide for the construction, rehabilitation, purchase, leasing and refinancing of housing for such persons and families who would otherwise be unable to obtain adequate dwelling accommodations which they could afford and to aid in the acquisition of land for present or future developments including such housing accommodations; * * *."

is because it provides a degree of objective uniformity. Because income taxes vary with individual circumstances, most income taxes and their effects must be ignored or they will destroy valuation uniformity. As noted in *Joseph Hydro Associates Ltd. v. Dept. of Rev.*, 10 OTR 277, 282-83 (1986):

"[T]he income tax consequences to the seller must be ignored. There are a number of reasons for this. First and probably foremost is the fact that income tax consequences to the seller usually have no effect on the market value of the property. Second, income tax consequences may vary drastically from person to person while ad valorem taxes are assessed in rem."

Hence, the best assurance of uniformity and fair property taxation is to rely upon market values.

Whether the market considers government compensation for restrictions placed on property depends upon the circumstances. In most cases, past compensation paid is irrelevant to the market. For example, if government takes an easement over property by the power of eminent domain, it will compensate the owner for the value of the easement taken. The remaining property, subject to the easement, has a reduced market value. In determining the market value of the remaining restricted property, the market will consider only the uses for which the property may be utilized. The market will not consider the compensation paid by the government because no participant in the market will receive that compensation.

In some cases the market may reflect some or all of the compensation. For example, some government programs subsidize housing for the poor by direct payments to the owner to make up the difference between actual rent and market rent. If a purchaser of that property could receive the same benefits, the market value will reflect the value of those benefits. It does not matter whether the payments are direct payments or tax credits. The question is whether the market may obtain or participate in those benefits.

In these cases, as of the assessment date in question, the tax credits attributable to the subject properties had been sold. Whether considered a source of financing or a source of benefits to be derived from the properties, as of the assessment date no purchaser in the market would receive

any such benefits. Hence, the tax benefits cannot be added to or included in the income from the properties.

## EFFECT OF RESTRICTIONS

The effect of the governmental restrictions on the subject properties is to limit the rent receivable from them for a period of 15 years. The market recognizes the time value of money; *i.e.,* dollars to be received in the future are worth less than current dollars. *See* Appraisal Institute, *The Appraisal of Real Estate,* 590-91 (10th ed 1992). Consequently, in the early years of the restrictions, the market will substantially discount the value of the properties. Toward the end of the restricted period, that discount will be minimal because the market will anticipate charging market value rents in the near future.

In these cases, defendant's appraiser used market rents. Plaintiffs' appraiser used contract rents. The assessment date in question falls early in the 15-year period of restricted rents. Consequently, the true cash value of the properties should be measured by their actual or contract rents.

Defendant asserts that because Bayridge was not complete and operating on the assessment date, the income approach cannot be used for that property. However, since governmental restrictions limit the value of the property, the cost approach would give an excessive indication of value. Since there is no data for the sales comparison approach, the only remaining approach is the income approach. Assuming 100 percent occupancy, as plaintiffs have, overcomes the lack of an income history and provides a reasonable basis for using the income approach.

The court finds that, as of January 1, 1990, the true cash value of the Durham Park property was $6,535,000, and the true cash value of the Bayridge property was $4,412,000.

Department's Opinion and Order No. 90-2016 is set aside. Costs to neither party.