Argued and submitted January 5, judgment of the Tax Court affirmed April 21, 1995

BAYRIDGE ASSOCIATES LIMITED PARTNERSHIP,
formerly known as
A & G Builders, Ltd.,
*Respondent,*

*v.*

DEPARTMENT OF REVENUE,
STATE OF OREGON,
*Appellant.*

(OTC 3271)

DURHAM PARK LIMITED PARTNERSHIP,
*Respondent,*

*v.*

DEPARTMENT OF REVENUE,
STATE OF OREGON,
*Appellant.*

(OTC 3272)
(SC S41163)
892 P2d 1002

Robert B. Rocklin, Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

David P. Weiner and Anne L. Meagher, of Samuels, Yoelin, Weiner, Kantor & Seymour, argued the cause and filed the brief for respondents.

GRABER, J.

Van Hoomissen, J., filed a dissenting opinion in which Fadeley, J., joined.

## GRABER, J.

This case involves the valuation, for ad valorem tax purposes in the tax year 1990-91, of two apartment complexes — the Durham Park Apartments, located in Tigard, and the Bayridge Apartments, located in Beaverton. The Tax Court found that the true cash value of the Durham Park property was $6,535,000 and that the true cash value of the Bayridge property was $4,412,000. *Bayridge Assoc. Ltd. Partnership v. Dept. of Rev.*, 13 OTR 24, 31 (1994). On *de novo* review, ORS 305.445, we affirm.

Durham Park Limited Partnership and Bayridge Associates Limited Partnership (taxpayers) receive federal income tax credits, under 26 USC § 42 (IRC § 42), in return for operating the properties at issue as low-income housing. The Tax Court held that that arrangement, as applied by the Oregon Housing Authority (OHA),[1] constitutes a "governmental restriction as to use" of the properties under ORS 308.205(2) (1989).[2] 13 OTR at 27-28. The Tax Court concluded that the "governmental restriction as to use" made taxpayers' appraisal based on actual or contract rents more accurate in determining the true cash value of the properties than the appraisal based on market rents conducted by the Department of Revenue (department). *Id.* at 31.

The department appealed. The issue presented on appeal is a legal one: whether a property owner's participation in the section 42 low-income housing program constitutes a "governmental restriction as to use" of the property, thereby requiring a reduction in the assessed value of the property pursuant to ORS 308.205(2) (1989). There are no

---

[1] The Oregon Housing Authority has been succeeded by the Housing and Community Services Department. ORS 456.555.

[2] ORS 308.205 (1989) provided in part:

"*True cash value of all property, real and personal*, means the market value of the property as of the assessment date. True cash value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue and in accordance with the following:

"* * * * *

"(2) If the property is subject to governmental restriction as to use on the assessment date under applicable law or regulation, true cash value shall not be based upon sales that reflect for the property a market value that the property would have if the use of the property were not subject to the restriction unless adjustments in value are made reflecting the effect of the restrictions."

factual issues. The department and taxpayers agree about the operative facts, and they do not quarrel with each other's calculations; we simply must determine whose appraisal to accept.

Durham Park was completed in 1989. The project contains 224 living units in 28 eight-unit (8-plex) buildings. The 8-plexes are all three-story buildings. There are separate one-story buildings that contain garages, offices, and a recreation area. Durham Park was constructed, and is operated, as a low-income housing project.

The Bayridge complex is similar to the Durham Park project. It is a multi-building, 246-unit development. Bayridge was constructed, and is operated, as a low-income housing project. Bayridge was 60 percent complete as of the assessment date.

Under 26 IRC § 42, the owner of an apartment complex may qualify for substantial income tax credits. As the Tax Court properly noted, "[t]he laws governing income tax credits and low-income housing are complex." 13 OTR at 26. *See generally* Andrew Zack Blatter and Elena Marty-Nelson, *An Overview of the Low Income Housing Tax Credit*, 17 U Balt L Rev 253 (1988) (providing a detailed examination of the operation of the low-income housing tax credit). A brief overview of that law will suffice for our purposes here.

The low-income housing tax credit is available for certain low-income housing projects. IRC § 42(a), (c)(2), (g). In order to qualify for that credit, the owner of, or investor in, an apartment complex must make available a certain number of rental units in the project for use by the general public on a residential (*i.e.*, nontransient and noncommercial) basis for not less than 15 years. IRC § 42(g), (i)(1). If the owner or investor qualifies, section 42 provides income tax credits to the owner or investor over a 10-year period, IRC § 42(f)(1), based on the cost of the building and the proportion of the building used by low-income tenants, IRC § 42(a)-(d).

The Internal Revenue Code (Code) places a limit of $1.25 per capita on the aggregate amount for each taxable year that may be claimed as credits by all the taxpayers in a given state. IRS § 42(h)(3)(C). The Code requires that "the State housing credit ceiling for each calendar year shall be

allocated to the housing credit agency of" each state. IRC § 42(h)(3)(B). The state agency allocates those credits to owners or investors. IRC § 42(h)(3)(A). In 1990, Oregon had $2,643,750 in tax credits to allocate.

If a project fails to comply with the tenant and rent limitations in IRC § 42 at any time during the 15-year compliance period, the taxpayer is subject to a recapture of a portion of the credit claimed. IRC § 42(j). Additional taxes, plus interest, will be due as a result. IRC § 42(j)(2). When a sale occurs before the end of the 15-year compliance period, it is possible to avoid recapture on the sale of a low-income housing project that qualifies for tax credits under IRC § 42. To accomplish that, the seller of the project must post a bond in an amount satisfactory to, and for the period required by, the Secretary of the Treasury, if it reasonably is expected that the project will continue to be operated as a qualified low-income project for the remainder of the building's compliance period. IRC § 42(j)(6). The amount of the required bond generally equals or exceeds the value of the credits claimed or available. *See* Rev Rul 90-60, 1990-2, CB 2 (explaining bond).

In Oregon, for the tax year in question, the OHA administered the distribution of federal tax credits for low-income housing. ORS 456.559(1)(f) (1989). That agency was established by statute, ORS 456.553(1) (1989), in response to the legislature's conclusion that there was an inadequate supply of low-income housing in Oregon and that it was the desire of the state to ensure an adequate supply of such housing. ORS 456.550 (1989). If a taxpayer received credits under IRC § 42 and later failed to comply with the federal statutory requirement, OHA would report that noncompliance to the Internal Revenue Service. *See* Treas Reg § 1.42-5(e)(1) (so providing).

Under IRC § 42, as already noted, the taxpayer claiming the credit must limit rents in the complex to obtain the tax credits. OHA set additional requirements. For example, OHA's allocation document pertaining to the properties in question incorporated by reference the terms and conditions set forth in taxpayers' applications for tax credits. Those applications provide that taxpayers must

"[a]gree to rent, or hold available for occupancy, for 15 years at least 20% of the dwelling as Rent Restricted Units

for low-income tenants whose incomes are 50% or less of area median gross income adjusted for family size, or at least 40% of the dwelling as Rent Restricted Units for low-income tenants whose incomes are 60% or less of area median gross income adjusted for family size."

Against that background, we examine the applicable Oregon statutes. ORS 308.232 (1989) required all property to be assessed at 100 percent of its true cash value. ORS 308.205 (1989), quoted at note 1, above, defined "true cash value" as "the market value" of the property. However, ORS 308.205(2) (1989) also provided that, when a property was "subject to governmental restriction as to use," true cash value must be adjusted to reflect or take into account that restriction.

Taxpayers argue (and the Tax Court held) that the federal low-income housing tax credit program, as administered by OHA, constitutes a "governmental restriction as to use" that needs to be taken into account in determining the true cash value of the property pursuant to ORS 308.205(2) (1989). The department counters that the section 42 program is not a "governmental *restriction*," because a "governmental restriction" must be involuntary and it must not be to a taxpayer's financial advantage. The department further contends that, even if the program is a "governmental restriction," it is not a governmental restriction "as to *use*" of the property. For the reasons that follow, we agree with taxpayers and the Tax Court.

In interpreting a statute, our task is to discern the intent of the legislature. ORS 174.020; *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). The text of the statutory provision in question is the best evidence of the legislature's intent and the starting point for our inquiry. *Id.* at 610. Words of common usage typically should be given their plain, natural, and ordinary meaning. *Griffin v. Tri-Met*, 318 Or 500, 508, 870 P2d 808 (1994).

We use the foregoing principles in interpreting ORS 308.205(2) (1989). That statute did not define "restriction." In ordinary usage, a "restriction" is:

"1: something that restricts: QUALIFICATION: as a: a regulation that restricts or restrains * * * b: a limitation placed on the use or enjoyment of real or other property; *esp*:

an encumbrance on land restricting the uses to which it may be put." *Webster's Third New Int'l Dictionary*, 1937 (unabridged ed 1993).

A restriction thus is "a limitation placed on the use or enjoyment" of the property, without any necessary reference to the process that led to the placement of that restriction, without any necessary reference to the form of the restriction (*e.g.*, by statute or by contract), and without any necessary reference to the absence of an economic benefit in exchange for placement of that restriction.

ORS 308.205(2) (1989) also used, without defining it, the adjective "governmental" to modify the noun "restriction." In ordinary usage, "governmental" means "of or relating to government or to the government of a particular political unit." *Webster's Third New Int'l Dictionary* at 983. A "governmental" restriction thus is a limitation "of * * * the government of a particular political unit," placed on the use or enjoyment of property. There is no necessary reference to who initiated the process that led to the government's placement of a restriction on the property, nor is there a necessary reference to how the restriction is expressed (*e.g.*, by statute or by contract), nor is there a necessary reference to whether the restriction was placed in exchange for an economic benefit.

■    As noted above, the department first argues that the availability of section 42 tax credits does not create a "governmental restriction," because (a) the taxpayer chooses to participate in the program and (b) the program results in financial gain to the taxpayer. We are not persuaded.

Nothing in the text of ORS 308.205(2) (1989) suggests that a "governmental restriction" must be involuntary at its inception. Neither does the text suggest that a taxpayer may not derive an economic benefit from a "governmental restriction." The text of ORS 308.205(2) (1989) does not distinguish between voluntary and involuntary, or between beneficial and nonbeneficial, "governmental restrictions." We are not at liberty to read in such requirements. *See* ORS 174.010 (when this court interprets a statute, it may not

"insert what has been omitted, or * * * omit what has been inserted").[3]

Taxpayers entered into an agreement with OHA that limited the rents that taxpayers could charge to tenants residing in taxpayers' properties and limited the pool of tenants to whom they could rent apartments. Taxpayers agreed to those limitations for a period of 15 years. As of the assessment date, those limitations restrained how taxpayers could enjoy their property. Those limitations came from a binding agreement with a governmental agency, the breach of which would entail serious financial consequences to taxpayers. Thus, the limitations were "governmental restrictions."

The department next argues that, even if participation in the section 42 low-income housing credit program is a "governmental restriction," it is a "governmental restriction as to *income*" but not a "governmental restriction as to *use*." (Emphasis added.) Again, we disagree.

The noun "use" means, among other things, "a method or manner of using something"; "the legal enjoyment of property that consists in its employment, occupation, exercise, or practice." *Webster's Third New Int'l Dictionary* at 2523. Utilizing that definition, a "governmental restriction as to use" includes a governmental restriction as to the method or manner of using the property in question, or as to how the property is employed or occupied.

As already explained, taxpayers are subject to governmental restrictions concerning the persons to whom they may rent, as well as how much they may charge those to whom they rent. Furthermore, under those governmental restrictions, taxpayers must provide a certain number of *residential housing* units. That is, taxpayers must maintain

---

[3] We also note that prior decisions from this court indicate that voluntarily incurred limitations on the use of property may be considered in assessing the value of a piece of property. *See, e.g., Tualatin Development v. Dept. of Rev.*, 256 Or 323, 473 P2d 660 (1970) (when the taxpayer voluntarily agreed with county planning commission to set aside "open areas" to be retained as a golf course in return for a zone change permitting a planned residential community, and the golf course is operated at a loss, court affirmed Tax Court's decision that golf course had no "true cash value" for tax years at issue).

at least a part of the complexes as residential. Even if taxpayers wanted to use the properties for nonresidential purposes (such as commercial purposes), and even if those uses were permitted by applicable zoning laws, the governmental restrictions placed on those properties would inhibit such a use. Those limits on what taxpayers may *do* with their properties, resulting from taxpayers' participation in the section 42 program, constitute "governmental restriction[s] as to use."

The context of ORS 308.205(2) (1989) supports the view that the legislature intended that the phrase "governmental restriction as to use" to encompass a broad realm of potential governmental limitations. The context of a statute includes other provisions of the same statute and other related statutes. *PGE*, 316 Or at 611.

The provision that became ORS 308.205(2) (1989), containing the phrase "governmental restriction as to use," was added to the statute in 1977 as part of Senate Bill 827. Or Laws 1977, ch 423, § 2. Senate Bill 827 contained six sections:

Section 1 added a new provision to ORS chapter 308 to address downzoning, a situation in which "the assessed *value of any real property is reduced* by reason of the adoption of or a change in the comprehensive plan, zoning ordinance, or zoning designation for such property *not at the request of the owner.*" (Emphasis added.) Section 1 provided that the owner of a downzoned property may have that property reassessed to take into account the loss in value caused by the downzoning. Section 1 is codified as ORS 308.341.

Section 2 added what became ORS 308.205(2) (1989), the statute that we are called on to apply in this case. The remaining substantive sections of Senate Bill 827 addressed the notification of property owners and assessors concerning the downzoning of their property and are codified as ORS 308.342 and 308.343.

Section 2 embraced all forms of "governmental restriction[s] as to use," in contrast to the other sections, which were directed more specifically at downzoning. Moreover, while section 1 expressly limited the tax benefit to *involuntary* downzoning, section 2 contained no similar requirement for other forms of governmental restriction as to

use. In addition, downzoning is defined to result in an *economic detriment* to the taxpayer, while other forms of governmental restriction as to use are not.

■     This court assumes that, when the legislature includes a provision in one section of an act, but omits it from another, it does so intentionally. *PGE*, 317 Or at 611. Thus, we must give effect to the distinctions drawn by the legislature (a) between voluntary downzoning, from which a taxpayer may not receive a tax benefit, and other forms of governmental restriction as to use, which omit the concept of voluntariness; and (b) between downzoning, which is defined to result in an economic detriment to the taxpayer, and other forms of governmental restriction as to use, which omit the requirement of economic detriment. We conclude that a "governmental restriction as to use," ORS 308.205(2) (1989), need not be involuntary and may result in an economic benefit to the taxpayer.

So understood, ORS 308.205(2) (1989) encompasses, as a "governmental restriction as to use," taxpayers' participation in the section 42 program. Because the intent of the legislature when it enacted ORS 308.205(2) (1989) is clear from the text and context of the statute, further inquiry is not required. *See PGE*, 317 Or at 611 (stating principle).

As noted at the outset, the parties do not attack the calculations made by each others' appraisers. The department's data do not reflect the limits placed on the properties as a result of the "governmental restriction[s] as to use"; taxpayers' data do reflect the limitations placed on the properties. Accordingly, we adopt taxpayers' valuations.

The department does argue that, even if we treat participation in the section 42 program as a "governmental restriction as to use," we should "consider the receipt of tax credits as additional income that increases the value of the property." The Tax Court reasoned that

> "an underlying assumption of market value is that the market will only pay for those benefits it will receive. If tax benefits are limited to the first owner or are recaptured when a property is transferred, such benefits will not enter into market considerations." 13 OTR at 29.

We agree with that reasoning. OAR 150-308.205(A)(1)(a) (1989) defined market value as "the most probable price in terms of money which a property will bring if exposed for sale in the open market." The most probable price depends on what the buyer will receive in exchange for that price; the buyer will pay only for what it will receive. Thus, the most probable price to be received for the properties at issue would not include the tax credits, because the record shows that the credits would be recaptured if the property were not maintained as low-income housing.

For the foregoing reasons, we find that, for tax year 1990-91, the true cash value of the Durham Park property was $6,535,000 and the true cash value of the Bayridge property was $4,412,000.

The judgment of the Tax Court is affirmed.

**VAN HOOMISSEN, J.,** dissenting.

ORS 308.205(2) (1989) provided:

> "If the property is subject to *governmental restriction as to use* on the assessment date under applicable law or regulation, true cash value shall not be based upon sales that reflect for the property a market value that the property would have if the use of the property were not subject to the restriction unless adjustments in value are made reflecting the effect of the restrictions." (Emphasis added.)

The question is: "Do the low-income housing restrictions voluntarily placed on the property [by the owner] constitute 'governmental restrictions [as to use]' under ORS 308.205(2)?" *Bayridge Assoc. Ltd. Partnership v. Dept. of Rev.*, 13 OTR 24, 26 (1994).[1]

ORS 308.232 (1989) required all property to be assessed at 100 percent of its true cash value. True cash value was defined by ORS 308.205 as "the market value" of the property. *See also* ORS 308.235(1) (factors to be considered in assessing taxable real property). The general rule is that

---

[1] Taxpayers are Bayridge Associates Limited Partnership and Durham Park Limited Partnership. The persons entitled to the IRC § 42 tax credit are the owners of the limited partnerships.

market rents are used in appraising income-producing property. OAR 150-308-205(A)(2)(g) (1989).[2] We are asked to determine whether, by enacting ORS 308.205(2) (1989), the legislature intended to change that general rule in the circumstances of this case.

The majority holds that taxpayers' voluntary choice to participate in the federal low-income housing program to maximize the return on their investment amounts to a "governmental restriction as to use" of the taxpayers' property. 321 Or at 31. ORS 308:205(2) (1989). I disagree and would hold that taxpayers' voluntary choice to receive federal income tax credits under IRC § 42 in return for charging below-market rents, a choice which I believe it is fair to assume was driven by taxpayers' interest in maximizing the return on their investment, does not create a "governmental restriction" on taxpayers' property.[3] Moreover, even if taxpayers' choice had created a "governmental restriction," the restriction would be as to income only and not as to taxpayers' "use" of the property. ORS 308.205(2). For those reasons, I respectfully dissent.

The majority begins its statutory construction analysis with a dictionary definition of "restriction." 321 Or at 27-28. That definition indicates that a restriction is "something that restricts." If one looks further in the dictionary at that point, one discovers that "restrict" is defined as:

> "**1:** to set bounds or limits to : hold within bounds: as **a:** to check free activity, motion, progress, or departure of : RESTRAIN <intellectual snobbery which has tended to [restrict] men and women from an understanding of religion — A. H. Compton>; *also* : HAMPER, DIMINISH **b:** to check, bound, or decrease the range, scope, or incidence of : set what is to be included or embraced by : bar or carefully govern addition or increment to <countries where literacy was largely [restrict]ed to the upper classes — Helen Sullivan>

---

[2] Pertaining to real property valuation for tax purposes, OAR 150-308-205(A)(2)(g) (1989) provided in part that the income to be used in the Income Approach to Valuation "shall be the economic rent that the property would most probably command in the open market as indicated by current rents being paid, and asked, for comparable space."

[3] Taxpayers have never suggested that their motivation for participating in the federal low-income housing program is anything other than to maximize the return on their investment (which is a lawful and reasonable motivation).

**2:** *to place (land) under restrictions as to use (as by zoning ordinances).*" *Webster's Third New Int'l Dictionary* 1937 (unabridged 1993) (emphasis added).

Thus, a zoning ordinance is clearly within the common meaning of "restriction." Something of value has been taken from the property owner for the benefit of the public. The majority offers unpersuasive justification for its conclusion that a taxpayer's voluntary choice to participate in a federal low-income housing program for the taxpayer's own financial gain likewise is a "restriction." Nothing of value has been taken from the property owner, because the property owner is compensated by the federal income tax credit. The property owner expects to have more value, *i.e.*, financial return, not less, as a result of its agreement with the federal government.

There are numerous differences between a voluntary choice to financially structure one's property in a certain manner in order to maximize the financial return on one's investment, on the one hand, and having the use of one's property restricted without one's consent by the government as a result of a zoning ordinance, on the other.[4] Generally,

---

[4] The Tax Court stated:

"The fact that governmental restrictions are voluntarily incurred by an owner in exchange for income tax benefits is irrelevant. The statute is not limited to involuntarily incurred governmental restrictions. Many restrictions on property, including zoning restrictions, are sought and obtained at the request of the property owner. This court has previously held that where a landowner voluntarily grants a scenic easement to government, the land in the hands of the owner may have no real market value. *Marchel v. Dept. of Rev.*, 9 OTR 317 (1983). Also, where an owner voluntarily imposes 'open space limitations' on property, it may result in a zero taxable value. *Tualatin Development v. Dept. of Rev.*, 256 Or 323, 473 P2d 660 (1970)." *Bayridge Assoc. Ltd. Partnership v. Dept. of Rev.*, 13 OTR 24, 27-28.

The Tax Court's reliance on *Marchel* and *Tualatin Development* is misplaced. In each of those cases, the court found that the subject real property had no real market value to the taxpayer. Unlike *Marchel*, this case is not about taxation of property that has "no immediate market value." *Marchel*, 9 OTR at 319-20.

In *Tualatin Development*, this court upheld the Tax Court's holding that the golf course in a "planned residential community" had no value for property tax purposes. In *Tualatin Development*, "restrictions placed upon the initial development of [the property] by the Washington County Planning Commission required the [taxpayer] to set aside 'open areas' in various places in the development." 256 Or at 325 (quoting Tax Court opinion). In that case, a county ordinance required a developer seeking to develop a planned residential community to apply for and receive certain zoning changes. The taxpayer did so. This court held that "[t]he requirement that [the golf course] be maintained as open space determines or substantially affects its value." *Id.* at 326. This court's determination that the golf course had no value was

zoning, by its very nature, is involuntary in the sense that individual property owners may not elect how they wish to use their property and have it zoned accordingly. Zoning is an absolute governmental restriction on the use of property, in force until the zoning is changed or some sort of variance is obtained from the government. Moreover, zoning is generally, but not always, unilateral. That is, it is imposed by the government rather than the result of voluntary and bilateral consent of the parties.

The tax credit available to taxpayers here through IRC § 42, however, involves no such restriction on the "use" of property.[5] These apartments were built for multi-family

based on two factors: First, the court stated, the taxpayer could not "sell the land free of the zoning restrictions or put it to any use which would interfere with its functions as 'open space.' " *Id.* at 327. Second, the value of the golf course was reflected in the higher prices commanded by residential lots bordering on the course. *Ibid.* This court looked to cases from other states after stating that "[t]he question of the proper assessment valuation of land where the use is *so severely restricted that its owner derives no benefit from the ownership* is a new one in Oregon." *Id.* at 329 (emphasis added). The court noted the significance of "the limitations on plaintiff's own *use*" of the property. *Id.* at 330 (emphasis added).

The decision in *Tualatin Development* is consistent with the department's position in this case. The restrictions in *Tualatin Development* were "governmental restrictions as to use" of the golf course. The restrictions were (1) imposed by a local governmental unit; (2) zoning or land use restrictions; (3) restrictions as to the use of the property; (4) so severe that the taxpayer derived no benefit from the property; and (5) restrictions that resulted in an increased value for surrounding property.

In contrast, taxpayers in this case chose to forego certain financial benefits in return for others; they traded one income stream for another. The requirements of IRC § 42 and the Oregon Housing Authority are not so severe as to prevent taxpayers from deriving any benefit from the properties. Nothing in the law affects the *use* of the property; rather, *income* is limited in return for the receipt of federal income tax credits. In short, although the zoning law in *Tualatin Development* created a "governmental restriction as to use" of the golf course, that is not the case with respect to Bayridge and Durham Park.

[5] The Tax Court stated:

"It is important to note that the restrictions here are not imposed by IRC § 42. That law merely sets forth the requirements to obtain the tax credits. While the property owner must limit the rent to obtain the tax credits, there is no 'governmental' restriction on the property. *The restriction on the property arises as a condition imposed by the state for receiving the allocation.* The owner must specifically agree to limit the rental fees and this agreement is binding on any subsequent owners." 13 OTR at 28 (emphasis added).

I disagree. Under IRC § 42, the Oregon Housing Authority (OHA) merely serves as a conduit for the management of the federal low-income housing program. *See generally* ORS ch 456 (powers of housing authority). OHA's role is little more than that of a policeman, who must report to the federal government if the owner defaults under the program.

housing and that is how they are being used by taxpayers. Under IRC § 42, the property owner claiming the credit voluntarily agrees to limit the rents. That is, the owner voluntarily trades reduced rental income for a tax credit. This is nothing more than a financial arrangement, voluntarily chosen by the owner, for its own financial benefit. It is not a "restriction" on the use of the property involuntarily imposed by the government. As the majority opinion recognizes, 321 Or at 26, taxpayers may change the use of the property any time they want to do so. Taxpayers may sell the property to a buyer who may charge market rents. Of course, there may be some financial (tax) consequences resulting from taxpayers' voluntary choice to change the use of the property; however, those consequences are within the control of taxpayers, they are not involuntarily imposed on taxpayers by the government. Moreover, under the IRC § 42 program, the "use" of taxpayers' property is in no way "restricted" by any governmental action. Nothing in the law affects the "use" of the property; rather, income is limited in return for credits usable against federal income tax liability. The property in this case is operated as multi-family apartment buildings, which taxpayers and the department agree is the "highest and best" use of the property. When a taxpayer chooses to participate in a voluntary program that offers certain financial incentives in return for certain detriments, the taxpayer's property is not subject to a "governmental restriction" as to "use." Thus, ORS 308.205(2) (1989) does not support the Tax Court's decision.

The majority characterizes taxpayers' use of the property for low-income housing as coming "from a binding agreement with a governmental agency, the breach of which would entail serious financial consequences to taxpayers." 321 Or at 29. This evidences a misunderstanding of the facts. No "binding agreement" with the federal government is shown. Taxpayers may withdraw from the low-income housing program at any time. It is true that, should taxpayers withdraw from the program, the recapture provisions of the law provide that the claimed tax credits may be lost. In essence, by failing to continue using the apartments as low-income housing for the required number of years, taxpayers may lose certain tax advantages. While the choice not to use the property for low-income housing in the future may indeed

result in financial consequences to taxpayers, they are free to make that choice, forego the tax credits provided by IRC § 42, and charge market rents or use the property for another purpose. The availability of tax credits, however, does not "impose" a restriction. Taxpayers voluntarily chose to participate in the federal low-income housing program, because taxpayers thought it was financially advantageous to do so.

A choice not to abide by a zoning ordinance, however, results in much more serious consequences than failing to receive a tax incentive in the form of a federal credit. *See, e.g.,* ORS 215.185 (where use violates ordinance implementing a comprehensive plan, local government may "in addition to other remedies provided by law, institute injunction, mandamus, abatement, or other appropriate proceedings to prevent, temporarily or permanently enjoin, abate, or remove the unlawful * * * use"). A zoning ordinance is clearly a "governmental restriction as to use * * * under applicable law[.]" A voluntary choice to make use of one's property in a certain manner to maximize the return on one's investment, however, is not a "governmental restriction as to use."

The majority has confused the federal government's offer of a financial incentive (tax credits) to a property owner who voluntarily agrees to use its property in a certain manner and a taxpayer's voluntary acceptance of that offer, *i.e.,* an economic impediment created by contract, with a "governmental restriction as to use" of that property. The text of ORS 308.205 (1989) and IRC § 42 do not support the majority's result. I reject the majority's reliance on the fact that "[e]ven if taxpayers wanted to use the properties for commercial or industrial purposes, and even if those purposes were permitted by applicable zoning laws, the governmental restrictions placed on those properties would inhibit such a use." 321 Or at 30. Although a sale or a change in use might be in some ways "inhibited" by the tax credit elections, it would not be "prohibited." Taxpayers may withdraw from the federal program and lose the tax credits. Taxpayers may sell the property to a new buyer, who could raise the rents to market rates and lose the tax credits.

The context of the pertinent provisions of ORS 308.205 (1989) does not support the majority's result. The relevant provisions of that statute were added as part of

Oregon Laws 1977, chapter 423.[6] The Act pertained to changes in assessed value of land due to changes *in zoning*. Viewed in context with the rest of the Act, the purpose of the amendment to ORS 308.205 (1989), which provided a definition of "true cash value," was to conform that definition with

---

[6] Oregon Laws 1977, chapter 423, provided:

"SECTION 1: (1) If the assessed value of any real property is reduced by reason of the adoption of or a change in the comprehensive plan, zoning ordinance or zoning designation for such property not at the request of the owner, the owner on the date of the adoption or change may file a claim for exemption with the assessor. The claim shall be filed on or before April 1 of any year, but not later than two years after April 1 of the assessment year for which the assessed value was so reduced. The claim shall be on forms furnished by the assessor and approved by the Department of Revenue.

"(2) The assessor shall compute the difference in assessed value attributable to such reduction, between the assessed value of the property as of the January 1 assessment date for which the assessed value was so reduced, and the assessed value as of the January 1 immediately prior to such reduction. Beginning in the year in which the claim is filed and for four consecutive years thereafter, the assessor shall reduce the true cash value of the real property so affected by an amount equal to the difference in value so computed. In no case shall the true cash value be reduced below zero. The assessor shall notify the person in whose name the property is assessed of the amount of the reduction in value and of the approximate dollar amount of tax reduction, based upon the tax rate extended against the property on the last tax roll. The notice shall be mailed to the address of the person as indicated on the claim for exemption.

"SECTION 2. ORS 308.205 is amended to read:

"308.205. True cash value of all property, real and personal, means market value as of the assessment date. True cash value in all cases shall be determined by methods and procedures in accordance with rules and regulations promulgated by the Department of Revenue. With respect to property which has no immediate market value, its true cash value shall be the amount of money that would justly compensate the owner for loss of the property. With respect to property that is subject to governmental restriction as to use on the assessment date under applicable law or regulation, true cash value shall not be based upon sales that reflect for the property a market value that the property would have if the use of the property were not subject to the restriction unless adjustments in value are made reflecting the effect of the restrictions.

"SECTION 3. Section 4 of this Act is added to and made a part of ORS chapter 308.

"SECTION 4. (1) The directors of county and city planning activities within the county shall notify the county assessor of the adoption of or changes in comprehensive plans, zoning ordinances and zoning designations within 90 days after the date of the change.

"(2) The assessor shall notify the owner of property that has received a reduction in assessed value due to the adoption of or change in comprehensive plan, zoning ordinance or zoning designation. The notice shall include a brief description of the plan or zoning change reflected in the reduced assessment. The notice shall inform the owner that he may apply for the exemption granted by section 1 of this 1977 Act and state the address from which further information pertaining to the exemption may be obtained. The notice shall be mailed to

the newly enacted provisions found in sections 1 and 4 of the Act. Certainly, there is nothing in the text and context of the Act to suggest that the amendment to the definition of "true cash value" was meant to apply to a taxpayer's *voluntary* choice to use its property in a certain way in order to maximize the return on its investment in commercial real estate.

From the text and context of ORS 308.205 (1989), I conclude that taxpayers' voluntary election to participate in a federal low-income housing program in order to maximize the return on their investment does not make the property subject to "governmental restriction as to use * * * under applicable law or regulation[.]"[7] Nor has the government

---

the last-known address of the person to whom the property is assessed at the address appearing in the tax records or to any new address reported in writing prior to the mailing of the notice. The notice shall be mailed within the time required and is subject to the provisions for notice of increased assessed valuation contained in subsection (5) of ORS 308.280.

"SECTION 5.   Sections 1 and 4 of this Act shall apply only to that property assessed pursuant to ORS 308.205 and 308.232 for the assessment year for which a reduction in value as described in section 1 of this Act occurs and for the immediately preceding assessment year.

"SECTION 6.   Sections 1 and 4 of this Act and the amendments to ORS 308.205 by section 2 of this Act shall first apply to assessment years beginning on or after January 1, 1978, with respect to changes in comprehensive plans and zoning effective on or after January 1, 1977."

[7] The Tax Court stated:

"The legislative intent in enacting this section is not clear. The law was enacted in 1977 as part of Senate Bill 827 (Or Laws 1977, chapter 423, § 2). The purpose of Senate Bill 827 was to compensate small property owners for loss of value due to 'down' zoning. However, that proposal was modified and the law as enacted provides only a partial exemption from taxation. *See* ORS 308.341." 13 OTR at 27.

The parties and the majority opinion here agree that the text and context of the statute are unambiguous, so that resort to legislative history is unnecessary. However, it is interesting to note that one of the sponsors of the bill described it as follows:

"The compensation plan I propose uses the existing property assessment and taxation mechanism. Land values, and thus property taxes, are determined by the 'highest and best use' of the land. When *government restrictions* remove some of these uses and thereby reduce[] the value of the land, my compensation formula goes into effect. When the landowner's property is *downzoned* he qualifies for a property tax credit." Senate Environment and Energy Subcommittee 2 on Land Use, May 9, 1977, Exhibit A (submitted by committee chair, Senator Dell Isham) (emphasis added).

"When *zoning restrictions* remove some of these uses and thereby reduce[] the value of the land and this is reflected in reduced property taxes, the tax relief formula goes into effect." Joint Trade and Economic Development Committee,

restricted the "use" of taxpayers' property. This is nothing more than a financial arrangement voluntarily chosen by taxpayers, whereby taxpayers have substituted one income stream (higher rents) for another (lower rents and tax credits), because taxpayers believe that will maximize the return on their investment. The below-market rents charged by taxpayers are not the result of a "governmental restriction"; rather, they are the result of a *quid pro quo* — federal income tax credits (a financial benefit) in return for charging the favored class below-market rents (a financial detriment).

The majority's interpretation of ORS 308.205 allows taxpayers to shift the burden of their taxation obligations to other taxpayers within the taxing unit, while reaping the benefits of a federal tax credit as well. Because of this result, taxpayers are able to reduce the valuation of their properties by more than $5,100,000, a loss other taxpayers of the taxing district will be expected to assume.[8] I find no support in the text and context of the statute for the conclusion that the legislature intended to shift the burden of taxation in this manner.

The legislature knows how to provide property tax relief to owners of low-income housing. For example, ORS 307.515-.537 provides for exemption from property taxation of low-income rental housing. Similarly, a property tax exemption is provided for low-income housing owned by a nonprofit corporation under ORS 307.540-.547. Had the legislature intended owners of property that qualified under IRC § 42 to be entitled to property tax relief on that basis, it surely would have provided for an explicit exemption or reduction. It did not. *See generally Keyes v. Chambers et al*, 209 Or 640, 645-46, 307 P2d 498 (1957) (tax exemption statutes shall be strictly construed).

---

June 13, 1977, Exhibit 212 (submitted by Senator Dell Isham) (emphasis added). It would appear from these statements that Senator Isham was not drawing any distinction between "zoning restrictions" and "government restrictions."

[8] The department found that the true cash value of taxpayers' property was $16,137,900. The Tax Court found that the true cash value was $10,947,000. 13 OTR at 31.

I would hold that the Tax Court erred in considering taxpayers' voluntary financing arrangement to be a "governmental restriction." Bayridge and Durham Park are not subject to "governmental restrictions." And, even if taxpayers' voluntary contractual agreement to accept lower than market rents could be considered to be a "governmental restriction," it is as to income only and not to "use" of taxpayers' property. ORS 308.205(2) (1989).

I would reverse the decision of the Tax Court and remand this case for entry of a judgment that the January 1990 true cash value of the property is as was determined by the department.

Accordingly, I respectfully dissent.

Fadeley, J., joins in this dissent.