[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The issue in this tax appeal is whether certain intangibles may be used in determining the fair market value of real estate.
On June 1, 1995, the plaintiff, Deerfield 95 Investor Associates, LLC (Deerfield) purchased the subject property located on 10 King Arthur Drive, East Lyme for $15,590,016. The subject property consists of thirteen clusters of one and one-half story wood framed residential buildings housing one hundred rental units located on 61.9 acres of land. The individual units are all two bedroom units. Sixty units were built in a Cape Cod style. Forty units were built in a colonial style. The whole complex is a well laid out, spacious and attractive complex located in the Niantic section of East Lyme adjoining the Niantic River. The complex is known as Deerfield Village and operates under the provisions of the Federal Low Income Housing Tax Credit Program (LIHTC), with financing provided by the Connecticut Housing Finance Authority (CHFA), and the State of Connecticut through the Department of Housing. At the time of the approval of the development, the town required a 99 year deed restriction providing that seventy-five of the units be reserved for low income tenants and the remaining twenty-five units be leased at market rentals. The first phase of the development began in 1991 when certificates of occupancy were issued for forty-six units. The remaining fifty-four units were completed and certificates of occupancy issued in 1995.
The assessor determined that the fair market value of the subject property as completed on the October 1, 1995 grand list CT Page 5905 was $8,797,500, trended back to the last town-wide revaluation date of October 1, 1991. The plaintiff claims the property was worth $2,490, 000 on the October 1, 1995 grand list, trended back to the October 1, 1991 revaluation date. Both the plaintiffs appraiser, Christopher S. Buckley, and the defendant's appraiser, Robert J. Flanagan, testified that the highest and best use of the property as improved was its actual use as restricted apartment units. We concur.
The LIHTC program was introduced by the federal government in 1986 to stimulate low-income housing. Instead of direct government payment to promote low-income housing, the LIHTC program was designed to motivate investors by providing tax credits that could be used to directly offset the federal income tax obligations of the investors. LIHTC projects, such as the subject property, are generally set up as a limited partnership in order to take advantage of the benefits of the real estate project. The four principal component benefits of a LIHTC project are: (1) low-income housing tax credits; (2) cash flow; (3) depreciation losses (depreciation losses are not credits which directly offset tax obligations but rather losses based on the investor's income — the higher the income, the greater the value of depreciation losses), and (4) residual value (the holding period for LIHTC programs requires that an entity own the property for fifteen years or face recapture of tax benefits as a penalty). R. Polton, "Valuing Property Developed with Low-Income Housing Tax Credits," The Appraisal Journal, July 1994, p. 450. (Defendant's exhibit7.)[1]
Essentially, an LIHTC project provides tax credits to the owner of the project as a tradeoff for the loss of income due to the restricted lower rentals of low-income housing. Id., p. 449. The sponsor of the project may choose to serve residents who have a family income level of 50% or 60% of the median family income level for the project area. Id., p. 448. The rents for low-income residents are calculated at 30% of a typical family's monthly income. Id. As a general rule, the income approach provides the most critical method of valuing LIHTC properties. Id., p. 452.
Because there are no Connecticut cases dealing with this subject, we turn to our sister states that have dealt with the effect of tax credits and government subsidies on the valuation of property for tax assessment purposes. The Oregon Supreme Court, in Bayridge Assoc. Ltd. Partnership v. Department ofRevenue, 321 Or. 21, 892 P.2d 1002 (1995), held that CT Page 5906 participation in a low-income housing program under 26 U.S.C. § 42
("IRC § 42") constitutes a "governmental restriction as to use" of property requiring a reduction in the valuation of the property for assessment purposes. Id. The court reasoned that since tax benefits are limited to the first owner, or are recaptured when the property is transferred, the market will only pay for benefits due the first owner and not subsequent owners. Id., 1007. "`[T]he most probable price in terms of money which a property will bring if exposed for sale in the open market' . . . . depends on what the buyer will receive in exchange for that price; the buyer will pay only for what it will receive. Thus, the most probable price to be received for the properties at issue would not include the tax credits, because the record shows that the credits would be recaptured if the property were not maintained as low-income housing." Id. TheBayridge court concluded that the taxpayer's agreement to limit rentals to low income tenants and to be bound by this agreement, the breach of which would cause serious financial consequences to the taxpayer, were "governmental restrictions." Id., 1006 . . . The governmental restrictions in Bayridge dealt with the investment value personal only to the then current owner. This is not market value. Investment value is the value of property to a particular investor, whereas market value is not related to the needs of individual investors but "is objective, impersonal, and detached; investment value is based on subjective, personal parameters." The Appraisal Institute, The Appraisal of Real Estate (10th Ed. 1992), p. 413.
In keeping with the reasoning in Bayridge, the Idaho Supreme Court in Greenfield Village Apartments v. Ada County, 130 Idaho 207,938 P.2d 1245 (1997) held that the restricted rents in low-income housing programs represent the actual and functional use of the property, which constitutes a major factor in determining the market value for assessment purposes. Id., 1248.
On the other hand, the Board of Tax Appeals for the State of Washington, in Cascade Court Limited Partnership v. Noble, BTA Docket Nos. 49295, 50249-50253, 50352, 96-17 to 96-18, 96-20 to 96-22, and 96-33 to 96-34 (1998), disagreed with the majority decision in Bayridge. The three board panel in Cascade Court
agreed with the two judge dissent in Bayridge in that:
[A] [t]axpayer's voluntary choice to receive federal income tax credits under IRC § 42 in return for charging below-market rents, a choice which I believe it is fair to CT Page 5907 assume was driven by taxpayer's interest in maximizing the return on its investment, does not create a "governmental restriction" on taxpayer's property. Moreover, even if taxpayer's choice had created a "governmental restriction," the restriction would be as to income only and not as to taxpayer's use of the property.
Cascade Court Limited Partnership v. Noble, supra, p. 19, citingBayridge Associates Ltd. Partnership v. Department of Revenue, supra, 892 P.2d 1008.
The taxpayers in Cascade Court claimed that the assessor should have determined the values of the subject properties based on the restricted rents. On appeal, the assessor recommended new values for the LIHTC properties bases upon a ten year discounted cash flow analysis. A representative property in Cascade Court, which is similar to the subject property in this case, was a new 100 unit apartment building completed in 1994. "The limited partner in Cascade Court provided equity for the property in the amount of $4,371,470 in exchange for a limited partnership interest and tax credits amounting to $869,999 in 1996. Over the ten-year period, that investment yields tax credits of about $8,699,900, a return of about 20% per year on the investment. [The State Department of Community, Trade and Economic Development] advanced $453,000 for this property. Seattle Housing Group has the option to purchase Cascade Court after the expiration of the fifteen-year compliance period for the greater of either the appraised value that considers restricted rent or the debt plus taxes." Id., pp. 35-36. The assessor's final recommendation of value for Cascade Court using the discounted cash flow approach and restricted rent and tax credits was $2,950,000. The taxpayer in Cascade Court excluded all tax credits and arrived at a value of $1.2 million. Id., p. 36.
The panel in Cascade Court noted that "[u]nder IRC Section 42, the property owner claiming the tax credit voluntarily agrees to limit the rents. That is, the owner voluntarily trades reduced rental income for a tax credit and below-market-rate mortgages. This is nothing more that a financial arrangement, voluntarily chosen by the owners, for their own financial benefit." Id., p. 38. The investors in Cascade Court also received depreciation and interest deductions, and deductible losses. Id., p. 39. The panel in Cascade Court found that the Internal Revenue Code regulations permit the transfer of tax credits, citing Holladay Hills LC v.County Board of Equalization of Salt Lake County, Utah State Tax CT Page 5908 Commission, Appeal Nos. 95-0400, 95-0405 through 95-0407, and 95-0408 (1997). Id. The panel in Cascade Court concluded that tax credits and interest subsidies affected the value of real estate and should not be ignored. Id., p. 49. "The final estimate of value must represent all the interests, benefits, and rights inherent in ownership of the subject real property." Id., p. 49, citing Folsom v. County of Spokane, 111 Wash.2d 256,759 P.2d 1196 (1988); Meadowlanes Ltd. Dividend Housing Assn. v. City ofHolland, 437 Mich. 473, 473 N.W.2d 636 (1991).
Meadowlanes Ltd. Dividend Housing Assn. v. City of Holland, supra, deals with a housing complex of 118 units which was federally subsidized under Section 236 of the National Housing Act, 12 U.S.C. § 1715z-1; 24 C.F.R. § 236.1 et seq. The benefits derived by a property owner of Section 236 property were: "(1) federal mortgage insurance of a private, long-term (forty year) mortgage loan in an amount not in excess of ninety percent of the FHA-determined certified cost of the project, and (2) monthly interest deduction payments made by HUD directly to the private mortgagee-lender on behalf of the mortgager-owner for all interest due under the mortgage in excess of one percent (the `interest subsidy')." (Footnotes omitted.) Id., 639. TheMeadowlanes court framed the issue of the case to be whether Section 236 federal government mortgage interest subsidies may be taken into account in determining the true value of real property; id., 641; and the court concluded that such subsidies should be considered. Id., 647-49. The court in Meadowlanes
theorized that while intangibles such as zoning and location are not themselves taxable, they can increase or decrease property values, and therefore should be included in the assessment process. Id., 647. The court found that "although the mortgage interest subsidy is an intangible, and not taxable in and of itself, it is a value-influencing factor." Id. The Meadowlanes
court reasoned that "the interest subsidy reduces the property's total operating costs and adds value by increasing the amount of debt the property can carry. Thus, it makes lower rents possible and allows the owner of § 236 property to take advantage of a highly leveraged rate of return on his equity investment in addition to reaping a number of tax shelter benefits. Despite the fact that the tenants benefit from the subsidy in the form of reduced rent, the statutory language creating the interest subsidy clarifies that the government's payment of all interest in excess of one percent . . . is a considerable benefit to the owner of § 236 property." (Footnotes omitted) Id., 647-48. InMeadowlanes, the court referenced a United States Tax Court CT Page 5909 decision that held that interest reduction payments made by HUD on behalf of Section 236 property owners were taxable to the owners as income. Id., 648; see Graff v. Commissioner, 74 T.C. 743
(1980), aff'd, 673 F.2d 784 (5th Cir. 1982) (Per curiam). TheGraff court reasoned that interest reduction payments took the place of rents, and were therefore a substitute for rents. Graffv. Commissioner, supra, 74 T.C. 757; see Meadowlanes Ltd.Dividend Housing Assn. v. City of Holland, supra, 473 N.W.2d 648. The interest subsidy payments are included as income by the property owner and deductible as an interest expense for federal income tax purposes. Meadowlanes Ltd. Dividend Housing Assn. v.City of Holland, supra, 473 N.W.2d 648. The court in Meadowlanes
concluded: "Since the benefits of the subsidy inure to the owner, their value is properly considered in the determination of the true cash value of the subject property." Id.
Another case which considered the impact of interest subsidies on the valuation of low income housing was GlenridgeDevelopment Co. v. City of Augusta, 662 A.2d 928 (Me. 1995). InGlenridge, the taxpayer owned a multi-family apartment complex that was built with interest subsidy payments from HUD under Section 236 of the National Housing Act of 1937. Glenridge paid a mortgage interest rate of 1% annually. HUD paid Glenridge's mortgage lender the difference between the market rate of interest and 1%. Glenridge contended that the State Board of Tax Review should not have included interest subsidy payments from HUD as income, and that governmental restrictions under which the owner operated should have been considered. The Maine Supreme Court in Glenridge held that the City, in valuing the subject property for assessment purposes, could consider the interest subsidy payments from which Glenridge benefitted [benefited]. Id., 931.
In Parkside Townhomes Associates v. Board of AssessmentAppeals, 711 A.2d 607 (Pa.Cmwlth. 1998), the Pennsylvania court held that "depreciation tax shelter benefits associated with investment property ownership inherently affect market value, and the court is not constrained to determine market value as though real property ownership lacked tax shelter features." Id., 611, citing In re Appeal of Johnstown Associates, 494 Pa. 433, 440,431 A.2d 932, 935 (1981).
When we analyze the present Deerfield development, we see that there were two major components which were critical to putting this project together. The first was the assumption by the plaintiff of two mortgages in favor of the CHFA and the CT Page 5910 Connecticut Department of Housing for approximately $10.8 million. Of the $10.8 million financing, $1 million was carried at market interest rates. The balance of the mortgage financing was to be repaid by the plaintiff at 1% and solely from 40% of available cash flow. The financing was non-recourse to the plaintiff. This 1% mortgage financing looks very much like the 1% interest financing recited in Meadowlanes and Glenridge. The second component to putting the Deerfield development together was the allocation of the tax credits represented by LIHTC. CHFA allocated approximately $200,000 of LIHTCs annually over a 10 year period to the plaintiff on condition that 75% of Deerfield's units be rented to low income residents. This aspect of the Deerfield development looks very much like the below market rents in Cascade Court developed under IRC § 42 as subsidized housing funded by below-market-rate rents, and the rent subsidies provided for in Meadowlanes under the Section 236 of the National Housing Act of 1937.
We find the rationale in Cascade Court, Meadowlanes andGlenridge to be more persuasive than that in Bayridge. We view the use of governmental subsidies to be a benefit to the owners of multi-family real estate developments rather than a "governmental restriction as to use which reduces the valuation of property. Not all governmental restrictions are a burden on property. As Meadowlanes points out, zoning and location do have a place in determining the value of real estate. Similarly, subsidized financing and subsidized rent do enhance the value of real estate. As pointed out in The Appraisal of Real Estate in a discussion of limited partnership interests: "Potential capital appreciation and eligibility for tax benefits, which are not limited to syndications, also influence investors and may affect market value. These factors and conditions are difficult to isolate, so analyses of comparable sales may be difficult." The Appraisal of Real Estate, supra, pp. 136-37.
We conclude that LIHTCs, although intangibles, do have an effect on the valuation of real estate for assessment purposes, and should be a factor in determining the fair market value of Deerfield as of October 1, 1991.
Based on the evidence and testimony presented at trial, we make the following findings. The subject property, as previously mentioned, was purchased for $15,590,016. Financing for the sale to the plaintiff consisted of three component parts:
CT Page 5911 1. $5.1 million cash.
 2. Assumption of a mortgage securing a note for $1.091 million with an interest rate of 9.72%.
 3. Assumption of a mortgage of approximately $9.4 million with an interest rate of 1% payable only if there is 40% of cash flow available. Failure to pay the interest on this note does not constitute a default under the terms of the mortgage.
The two mortgages held by CHFA and the Connecticut Department of Housing were for a 30 year term and are non-recourse notes.
We agree with the plaintiffs appraiser, Buckley, that this project was put together by CHFA and the Connecticut Department of Housing to bail themselves out of a bad deal. The sale to the plaintiff converted a bad debt portfolio of the two state agencies into a performing portfolio. There can be no expectation on the part of these two state agencies that they will ever be repaid on 90% of the outstanding debt of this project. From the standpoint of the plaintiff, it was given tax credits in the form of LIHTCs in exchange for providing low income housing. The tax credits awarded to the plaintiff consisted of seven year's worth of credits on the first phase of construction of the project and ten years of tax credits on the second phase completed in 1995. The total tax credits available to the plaintiff amount to approximately $8 million. The $8 million in tax credits were purchased by the plaintiff for the $5.1 million in cash that was put into the sale as the first component. These tax credits have their own market. The tax credits available to the plaintiff on the subject property were sold by the plaintiff in 1995 to a Midwest corporation for $5 million, according to Flanagan, the town's appraiser. The awarding of LIHTCs do not come without a price. If the plaintiff fails to comply with the tenant and rent limitations in IRC § 42 at any time during the fifteen year compliance period, the plaintiff is subjected to a recapture of a portion of the tax credits awarded and a restriction on the use of any remaining tax credits. See IRC § 42(j).
It is clear that the valuation of the subject property does not fall within the general rules for determining the fair market value. The cost approach may have been useful since the subject property was new construction and the highest and best use of the property was limited by restrictions to a single use. The CT Page 5912 Appraisal of Real Estate, supra, p. 316. However, neither appraiser adopted the cost approach, and therefore we are without sufficient data to consider this approach to value. The market sales approach is of little help since there is a dearth of comparable sales to the subject given the conditions and limitations placed upon the subject. We are mindful, for the reasons previously stated, that the sale of the subject property cannot be considered an arm's length transaction. In this regard, the purchase price of $15,590,016 is not reflective of the market value of the subject.
We find that tax credits do have an effect on real estate value and should be considered in the determination of the value of the subject. We agree with the plaintiff that the present value of all 1995 LIHTCs valued as of October 1, 1991 is approximately $3,600,000. We disagree with the plaintiff deducting the income from two units of the subject to arrive at gross income because the plaintiff used the two units for its management personnel. "Potential gross income is the total income attributable to a real property at 100% occupancy before operating expenses are deducted." The Appraisal of Real Estate, supra, p. 439. We recognize some property owners may make a decision to forego income from a rental unit in favor of providing an apartment for a resident manager. However, we do not view a 100 unit apartment complex large enough to justify two units being taken off the market as was done in the present case. Id., p. 446.
Given the circumstances of this case, we deem it appropriate to use the restricted effective gross income as developed by Flanagan, which amounts to $669,750. From the effective gross income, we deduct the restricted operating expenses of Flanagan, which amount to $273,480. The result of this deduction leaves us with a net operating income of $396,270. In determining the capitalization rate to be used in determining value, we note Flanagan used a capitalization rate of 11.75% for his discounted cash flow computations. Buckley, on the other hand, in his direct capitalization analysis, used an overall capitalization rate of 11.23% to which he added an effective tax rate of 1.75% to arrive at an overall tax loaded capitalization rate of 12.98%. We find Buckley's determination of the overall capitalization rate to be the more credible in this instance. Taking the net operating income of $396,270 divided by the capitalization rate of 12.98%, we arrive at $3,052,927. To this amount, we add the $3,600,000 stated by plaintiff in its trial brief to be the gross intangible CT Page 5913 value of all 1995 LIHTCs, as of October 1, 1991. This addition of $3,600,000 to $3,052,927 leaves us with a final valuation of $6,652,927.
The assessor for the Town of East Lyme had valued the subject premises on the October 1, 1995 grand list (based upon its value as of the October 1, 1991 revaluation date), at $8,797,500. We therefore find the subject property to be overvalued and that the fair market value of the subject property on October 1, 1991 was $6,652,927. We make this conclusion based on "the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and [our] own general knowledge of the elements going to establish value." NewburyCommons Ltd. Partnership v. Stamford, 226 Conn. 92, 105,626 A.2d 1292 (1993).
Accordingly, judgment may enter in favor of the plaintiff, without costs to either party, on the plaintiffs Fourth Amended Application filed February 23, 1999.[2]
Arnold W. Aronson Judge Trial Referee