AXELRAD, J.T.C.
This matter involves an appeal by the taxpayer for the 1997 tax year and cross-appeals for the 1998 tax year of the local property tax assessment of Penns Grove Garden Apartments, a government subsidized complex, known as Block 141, Lot 1 in Penns Grove Borough, Salem County, New Jersey. The subject improvements are situated on 11.572 acres and consist of thirteen two-story *257 garden apartment buildings containing a total area of 138,174 square feet and a single-story rental officedaundry/maintenanee shop building. There are 144 rental units, comprised of twenty-eight one-bedroom flats, seventy-two two-bedroom townhouses and forty four three-bedroom townhouses, of which 142 are occupied by low income tenants. There are two tenants who have been residents for many years whose income currently exceeds what is needed to qualify as a “low income” resident. Any rent the complex receives above the monthly rent reverts to the United States Department of Housing and Urban Development (“HUD”).
The subject units were constructed in 1974 as a “project certified” low income housing development under Section 236 of the National Housing Act of 1937, as amended. 12 U.S.C.A. § 1715z-1. The development is currently regulated by two contracts under the terms of Section 8 of the Housing Act, providing for direct rental assistance payments by HUD to the owner to supplement the rents which the tenants can afford to pay based on their incomes 42 U.S.C.A § 1437f. Under the subsidized housing programs, in return for providing decent, safe, and sanitary housing for low income families in private accommodations, assistance payments and other incentives are made available through HUD to developers and investors to construct and operate housing complexes such as the subject. These incentives are in the form of government guaranteed, non-recourse, assignable mortgages requiring minimal down payments; significant mortgage interest reduction subsidies; an initial developer’s fee; various state and federal tax credits and incentives; and budget driven rental payments and reimbursement for all costs associated with the property.
The subject property was assessed for both tax years as follows:
Land $ 177,200
Improvements 2,572,800
Total $ 2,750,000
*258 The relevant common level ratios of assessment to true value of the Director of the Division of Taxation for Penns Grove Borough pursuant to N.J.S.Á. 54:1-35.1, commonly known as “Chapter 123”, are 90.97% and 94.79 for the 1997 and 1998 tax years, respectively. The taxpayer’s appraiser concluded a fair market value of $2,100,000 for each year while the value conclusion of the municipality’s appraiser was $4,700,000 for each year. Both experts utilized the income capitalization and sales comparison approaches to value and placed primary reliance upon the income capitalization approach because of the investment nature of the subject property. .The principal differences in the analyses of the two experts were in their conclusions as to highest and best use and the appropriate capitalization rate Due to the absence of comparable market data contained in the record, the sales comparison approach' is not probative of the subject property’s true value and, thus, was not considered by the court.
For property tax assessment purposes, a property must be valued at its highest and best use. Ford Motor Co. v. Edison Tp., 127 N.J. 290, 300-01, 604 A.2d 580 (1992). As such, the first step in the valuation process is the determination of the highest and best use for the subject property. Highest and best use may be defined as:
the reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value.
[Appraisal Institute, The Appraisal of Real Estate, 297 (11th ed.1996) ].
As highest and best use is a market driven concept, the highest and best use of an improved property is the “use that maximizes an investment property’s value, consistent with the rate of return and associated risk.” Id. at 301, 604 A.2d 580. Although both experts concluded that the highest and best use of the subject property is its existing use, the taxpayer’s appraiser valued the property as a conventional garden-type apartment complex, while the municipality’s appraiser valued the property as a subsidized housing complex.[1]
*259 From inception, as of the relevant valuation dates and into the foreseeable future, the subject property was, is, and will be actually used as subsidized apartment housing. On July 16, 1974, the taxpayer entered into a Regulatory Agreement under Section 236 of the National Housing Act, as amended, with HUD insuring its mortgage and providing for an interest reduction contract subsidizing its 7% interest rate to 1% through August 1, 2014.[2] The taxpayer also executed a Housing Assistance Payment (“HAP”) contract dated October 1, 1978, for five years with continuing renewals, by which rentals were subsidized to enable persons of low income to reside in the subject property through reimbursement of all expenses of the complex. As of the dates of valuation, there were two HAP contracts in effect with expiration dates of July and September 1998, respectively. The municipality’s appraiser testified that the HUD agent for the subject proper *260 ty assured him the contracts would be renewed and there was often a lag time between the termination date and execution of subsequent HAP contracts. None of this was disputed by the taxpayer. Furthermore, since these contracts carry out the terms of the Regulatory Agreement, and he was not aware of any subsidized apartment housing going “off line” even with the threats of no funding, he would have no reason to suspect that they would not continue to be renewed through 2014. There was no testimony by the taxpayer’s appraiser at the trial, which tax place several months after the termination dates, that the contracts had not been renewed or that their termination was foreseeable.
The taxpayer’s appraiser did not consider the mortgage, regulatory agreement, and HAP contract in determining value because he contended that by doing so he would be valuing a leased fee interest rather than an unencumbered fee simple estate, as these documents are limited in duration and do not impose restrictions which encumber title. He claimed that this would be contrary to the constitutional mandate that all property must be “assessed according to the same standard of value,” N.J. Const, art. VIII, § 1, 1(a), and the implementing legislative mandate that the standard to be applied is “true value” which is the value of all interests in the property. N.J.S.A. 54:4-2.25; Town of Kearny v. Div. of Tax Appeals, 137 N.J.L. 634, 61 A.2d 208 (Sup.Ct.1948), aff’d, 1 N.J. 409, 64 A.2d 67 (1949); Englewood Cliffs v. Estate of Allison, 69 N.J.Super. 514, 525-26, 174 A.2d 631 (App.Div.1961).
The municipality’s appraiser did not value the property based on existing agreements with HUD. Rather, he considered the actual use, relevant locational and economic factors, and ownership incentives that were available on the relevant valuation dates, and he concluded that the highest and best use of the subject apartment building was for continued use as subsidized housing. In fact, he acknowledged that the subject property could be converted to conventional apartment housing if the HAP contracts were not renewed or the mortgage was satisfied. He concluded, however, that to do so would not be rational in light of all of the *261 economic benefits under subsidized programs available to a subsequent purchaser. According to the undisputed testimony of the municipality’s appraiser, incentives to continue the use of the subject apartment as subsidized housing include: an assignable government guaranteed, non-recourse mortgage providing for a 90% loan to value ratio and an interest reduction subsidy reducing the effective mortgage rate to 1%; an expense derived budget reimbursed in full by HUD through rental payments, including reimbursement of the mortgage payments and all properly documented, non-budgeted extraordinary expenses, allowing for a financially viable operation despite a 72% expense ratio, excluding taxes; the owner/management company’s ability to receive a management fee that is well above the management fee paid in the conventional market; the accumulation of large reserve accounts to which the owner will have unrestricted rights at the end of the term of the agreement; and owmership of a highly-maintained apartment complex at the end of the term of the agreements, due to the lack of any incentive by the owner to defer maintenance or reduce expenses as a result of HUD regulations, inspections at regular intervals, and reimbursement of all operating costs.
According to the municipality’s expert, a separate and distinct market exists for the use of multi-family buildings as subsidized housing as opposed to conventional housing.[3] This market serves a growing social need and advances the goal of providing safe, sanitary, and decent housing for those with low incomes, while providing a limited risk investment to its owners. A significant amount of housing is being built in response to this demand. In 1998, approximately 4,100,000 subsidized units existed in larger complexes in the United States housing 9,000,000 people, which amount does not include smaller one-to-four family unit housing. In addition to the subject property’s actual use for over twenty years as subsidized housing, the record demonstrates that the *262 market in Penns Grove is economically well-suited for and contains other large apartment complexes also used exclusively for subsidized housing, including the 120 unit garden complex known as Penn Village Apaitments, located next to the subject, and a high-rise complex known as Penn Towers that is owned by the county housing authority.
As both appraisers agreed, it was not financially or physically feasible for the subject complex to operate for other than subsidized housing, and the project would not have been constructed and could not have continued operating without the entire project’s having been subsidized. In addition, the complex had significant physical restrictions on its operation as conventional apartments since the units are not separately metered for gas or electric service. The landlord pays all utility costs, an obligation which the taxpayer’s appraiser acknowledged would not have been that expensive in 1974, but now is substantially more and is not the norm in the current market. In addition, the appraiser conceded that the total expenses of the complex are “probably at the top of the iceberg” in comparison to normal market expenses, which is an understatement based upon the commercial data presented by the municipality. The subject property had an approximately 72% expense ratio, excluding taxes, as of the dates of valuation. This ratio is substantially higher than the conventional garden apartment market range from 34.2% to 40.3%, and is more akin to the federally-assisted apartment range from 53.9% to 67.7%, with medians of 61.5% and 62.5%, as indicated in the 1996 Institute of Real Estate Management of the National Association of Realtors (“IREM”) Ineomes/Expense Analysis for Conventional Apartments and for Federally Assisted Apartments. The subject property’s expense ratio further demonstrates that this complex is-not suitable for operation as conventional housing. The- existence of a separate manual compiled by IREM detailing an income and expense analysis for federally-assisted apartments and one for conventional apartments further supports the conclusion of the municipality’s expert of two distinct markets.
*263 Actual use is a strong consideration in a highest and best use analysis. “[I]f plaintiff seeks to demonstrate that a property’s highest and best use is other than its current use, it is incumbent upon plaintiff, and not defendant, to establish that proposition (alternate use) by a fair preponderance of the evidence.” Ford Motor Co. v. Edison Tp., 10 N.J.Tax 153, 167 (Tax 1988), aff’d, 12 N.J.Tax 244 (App.Div.1990), aff’d, 127 N.J. 290, 604 A.2d 580 (1992). The taxpayer’s appraiser has failed to demonstrate that conventional housing will maximize the investment value of the subject apartment complex. He acknowledged that the subject project would not have been viable without the subsidies, and that it would be financially impossible to operate it as a conventional apar-tment complex with such high expenses without raising rents. It was clear that the market in Penns Grove would not support substantially higher rents. In addition, it would not be physically possible to shift the responsibility for payment of the utilities to the tenants without incurring a substantial expense for separately metering the units. Most significant, however, was the conclusion of the taxpayer’s appraiser that the highest and best use of the subject property was its “current use” and the undisputed, credible evidence presented by the municipality’s appraiser that there is a separate and distinct subsidized housing market for this apartment complex. As such, the court finds that the highest and best use of the subject property is a continuation of its current use for subsidized housing.[4]
*264 Since both experts agree that the “contract rent” actually paid by the subject tenants is the same as the “economic or mai*ket rent” in the area, the court is not valuing a leasehold interest because leased fee and fee simple are synonymous. As such, by concluding that the highest and best use is for subsidized, rather than conventional, apartment housing, the court need not deal with the issues involving the difference between contract and market rent addressed in the cases of Prowitz v. Ridgefield Park Village, 237 N.J.Super., 435, 568 A.2d 114 (App.Div.1989), aff’d, 122 N.J. 199, 584 A.2d 782 (1991), and St. Luke’s Village, Inc. v. Peapack & Gladstone Bor., 11 N.J.Tax 76 (Tax 1990). The actual HUD approved contract rents, effective October 1,1996, including all utility payments, are $522 for one bedroom units (28), $592 for two bedroom units (72) and $656 for three bedroom units (44), totalling potential gross rents (“PGR”) of $1,033,200.
The difference in the effective gross incomes (“EGI”) derived by the experts essentially results from in their respective vacancy and collection loss allowances and from the adding back by the municipality’s appraiser of the principal payment as additional income. An insufficient explanation was offered for including this payment, which is attributable to financing rather than the real estate. Accordingly, the court will not consider it in calculating EGI. The municipality’s appraiser used the actual vacancy from the 1996 Profit and Loss Statement. The taxpayer’s appraiser used a 5% “vacancy and collection loss” based upon his observation of four vacant units during several inspections and a 2% collection loss rate, which was consistent with the subsidized Penn Village complex and within the market range. Since the actual vacancy for 1996 was less than the stabilized three-year vacancy and no 1997 financial statements were offered, the court finds that 5% is a reasonable vacancy and collection loss rate. As the amount of “other income” estimated by both experts was almost identical, the court will adopt the figure used by taxpayer’s appraiser of $20,700 and EGI of $1,002,200.
The taxpayer’s appraiser performed a historical expense analysis from 1991 through 1996 and stabilized expenses consis *265 tent with the market. The municipality’s appraiser used actual expenses from the 1996 Profit and Loss Statement, which were higher, without performing any analysis. As the difference is minimal, and it is appropriate to stabilize expenses, the court will adopt the figure used by the taxpayer’s expert with an upward modification of the management fee. The taxpayer’s appraiser used 6.5% of potential gross income (“PGI”) because it was the market fee for managing apartments similar to the subject,[5] although actual management fees for 1996 amounted to 8.1% of PGI, prior years were substantially higher and the contract provided for 9.2% of the total monthly gross receipts. Since he valued the property as a conventional apartment complex without regard to its subsidized nature, and this type of project is management intensive due to ITUD standards and regulations, in fairness to the taxpayer based upon the court’s determination of highest and best use, it is appropriate to use the actual 1996 management fee. As such, the court finds the total expenses to be $734,500, resulting in a net operating income (“NOI”) of $267,700.
The primary difference between the experts’ conclusions of fair market value lies in their income capitalization rates, derived as a result of their determinations of highest and best use of the subject property. Both considered the capitalization rates for apartments for the third quarter 1996 reported in the American Council of Life Insurance (“ACLI”) Investment Bulletin and Korpacz Real Estate Investor Survey, reviewed the yields of alternate investments as of August and September 1996, such as pensions and annuities, long term Treasury Securities, corporate and municipal bonds, and employed the Band of Investment capitalization technique. Based upon a conventional housing market, the taxpayer’s appraiser used a 70% loan to value ratio and derived a pre-tax capitalization rate of 10.56%. Based upon the *266 highest and best use of the subject property for subsidized housing, the municipality’s appraiser valued the property in relationship to this market, using a 90% mortgage equity ratio based upon his knowledge of HUD rules, conversations with persons at HUD and N.J. Housing & Mortgage Finance Agency (“H.M.F.A.”), and the terms of the subject mortgage. He also derived a mortgage constant based upon the terms of the existing mortgage and arrived at a pre-tax capitalization rate of 3.33%. In further support of his number, he cited the lack of risk, 100% guarantee of income to offset expenses, assumability of the subject mortgage and assignability of the regulatory agreements, and the general tendency of HUD to reset the mortgage and escrows.
Although the capitalization rate derived by the taxpayer’s appraiser is within the range for conventional apartments, based upon the court’s determination of highest and best use as subsidized housing, it is not appropriate to adopt that rate. Neither is the court satisfied that the capitalization rate utilized by the municipality’s expert accurately reflects the subsidized housing market as of the dates of valuation, as his mortgage constant is dei’ived from the specific terms of the subject mortgage, that is, 90% loan to value ratio for a term of forty years at a 1% effective mortgage rate. Even though the subject mortgage is assignable by mutual consent, it is not appropriate in valuing a fee simple interest to use the exact terms of the mortgage on the property (absent proof that they are current market rates) to establish a cap rate. Additionally, the mortgage was more than halfway through its term as of the dates of valuation. Furthermore, although the municipality’s appraiser believed that based upon the overriding policy considerations of providing affordable housing, the subject mortgage would be re-issued to a subsequent purchaser containing the same terms, no evidence was presented in support of his conclusion. To the contrary, he acknowledged that the interest reduction payment plan for most of section 221 programs, which replaced section 236 programs which are no longer available, is at 3%, not the 1% contained in the subject *267 mortgage, based upon his general knowledge of recent housing projects in Pennsylvania.
As a result of failure to investigate subsidized housing in New Jersey, the municipality’s appraiser was unfamiliar with Mt. Laurel housing in New Jersey[6] and was unaware of (1) any newly constructed subsidized housing projects in southern New Jersey, or (2) the type of financing available. This lack of investigation, however, does not negate his overall conclusions that a separate and distinct housing market existed and that ownership of a non-deed restricted, federally guaranteed and subsidized housing complex is quite attractive and involves less risk than ownership of a conventional apartment complex. As the municipality’s appraiser emphasized, although state agencies may administer the various programs, HUD is the overseer and sets standard rules throughout the country for all programs.
Mortgage interest reduction subsidies, total reimbursement of all operating expenses by HUD, and other financing and tax incentives available to the investor in the construction and operation of a federally-subsidized apartment complex are benefits which can be taken into consideration when valuing the property. In establishing a capitalization rate, the court has considered the following: the longstanding and well-established commitment of the federal and New Jersey governments to provide affordable housing to those in need; HUD’s practice of providing nonrecourse financing with a higher than usual loan to value ratio and upon favorable terms, which still may include shorter periods, lower subsidies, caps on expense reimbursement, and other terms different from those of the subject financing; the availability of funding and tax incentives for subsidized housing; and the recognition that developer’s fees and certain tax credits are not available upon resale. In addition, the court has analyzed the yields of lower risk investments available as of the valuation dates shown in *268 the appraisal reports and concluded that the expected rate of return would be lower than that for conventional housing because of the guarantees, subsidies, and other incentives, but higher than that for a liquid risk-free investment. As there would be lower risk involved in the investment, a capitalization rate lower than that for conventional apartments is warranted. The court finds 5.35% to be a more reliable pre-tax capitalization rate for the subject property.[7] Adding in the effective tax rate, based upon the tax rate of $3.39 and the Director’s ratio of 90.97% for the 1997 tax year, and tax rate of $3 .49 and the Director’s ratio of 94.79% for the 1998 tax year, results in an indicated overall capitalization rate of 8.43% and 8.66% for each of the respective years. As such, under the income capitalization approach, the fan- market value of the subject property is $3,175,563 for the 1997 tax year and $3,091,224 for the 1998 tax year.
The foregoing analysis can be summarized as follows:
1997 tax year
Potential Gross Rents (PGR) $1,033,200
Less Vaeancy/Collection Loss Allowance 5% (51,700)
Plus Other Income 20,700
Effective Gross Income (EGI) $1,002,200
Less Expenses (734,500)
Net Income (NOI) to be capitalized 267,700
Pre-Tax Capitalization Rate .0535
Effective Tax Rate ($3.39 x 90.97%) .0308
Indicated Overall Capitalization Rate .0843
*269 Indicated Value Via Income Approach $3,175,563
1998 tax year
Potential Gross Rents (PGR) $1,033,200
Less Vacancy/Collection Loss Allowance 5% (51,700)
Plus Other Income 20,700
Effective Gross Income (EGI) $1,002,200
Less Expenses (734,500)
Net Income (NOI) to be capitalized 267,700
Pre-Tax Capitalization Rate .0535
Effective Tax Rate ($3.49 x 94.79%) .0331
Indicated Overall Capitalization Rate .0866
Indicated Value Via Income Approach $3,091,224
The lower limit of the common level range is 77.32% for the 1997 tax year and 80.57% for the 1998 tax year. The upper limit for the respective years is 104.62% and 109.01%, or 100%. See Caulfield v. Surf City Bor., 14 N.J.Tax 118 (Tax 1994). The ratio of the assessed valuation of the subject property to its true value for each of the tax years falls within the common level range promulgated by the Director of the Division of Taxation.[8] As such, in accordance with N.J.S.A. 54:51A-6(a), the assessments for the 1997 and 1998 tax years must be affirmed. The court will direct the entry of judgments accordingly.

 There is a significant body of case law throughout the country addressing the question of the appropriate way to value federally subsidized housing projects *259 for ad valorem taxation. See Kankakee County Board of Review v. Property Tax Appeal Board, 131 Ill.2d 1, 136 Ill.Dec 76, 544 N.E.2d 762 (1989); Executive Square Ltd Partnership v. Board of Tax Review, 11 Conn.App. 566, 528 A.2d 409 (1987), Steele v Town of Allenstown, 124 NH 487, 471 A.2d 1179 (1984) (following the majority view that contract rents, including the rental subsidies, must be considered m calculating the fair market value of government subsidized housing). But see Delhi Estates, Ltd v Hamilton County Board of Revision, 68 Ohio St.3d 192, 625 N.E.2d 594 (1994) (holding that, in valuing property involved in a government housing assistance program, rents and expenses of comparable unsubsidized housing in the open market must be utilized to the exclusion of actual rental income and expenses under the income approach to valuation); Meadowlanes Ltd. Dividend Housing Assn. v. City of Holland, 437 Mich. 473, 473 N.W.2d 636 (1991) (holding that the mortgage interest subsidy is an intangible value influencer to be considered in the assessment process in the same manner as tax benefits, location, and zoning); Bayridge Assoc Ltd Partnership v. Department of Revenue, 321 Or. 21, 892 P.2d 1002 (1995) (holding that participation in a low income housing program under 26 U.S C § 42 constitutes a governmental restriction as to use of property requiring a reduction in its value for assessment purposes).

 All documents were initially executed by the prior property owner, Penns Grove Associates. Pursuant to a partnership agreement and by deed recorded June 23, 1983, an internal conveyance was made to Penns Grove Gardens, Ltd., the principals of which were the same, and the obligations were assigned. The current taxpayer executed subsequent Housing Assistance Payment contracts with HUD.

 The municipality’s expert was a staff appraiser with the Federal Housing Administration at the beginning of his career from 1960-1964 and has continued to deal with HUD and related state agencies in Pennsylvania for appraisal jobs involving subsidized projects.

 See Kankakee County Bd of Review v. Property Tax Appeal Bd, supra, 136 Ill.Dec 76, 544 N.E 2d at 769 (1989) ("[t]he appraisers for both parties agreed that the best and highest use of the property is its current use as subsidized housing"); Executive Square Ltd. Partnership v Bd. of Review, supra, 528 A.2d at 412 (1987) (holding that based upon its "restrictions, financing and federal subsidy . . Section 8 housing has its own market and therefore the rental established for the subject property was market rent"); and Steele v. Town of Allenstown, supra, 471 A.2d at 1181 (1984) (holding that the highest and best use of the property is that of federally-subsidized housing and not the presumed, converted use as non-subsidi2ed multi-family housing. Even though the HAP contract is personal to the owner, since the property was designed and constructed as a federally-subsidized housing project, has operated as such, and is available to others for that use "such transmissible use is of material bearing in estimating value.").

 Although management expenses are usually expressed as a percentage of EGI since the entity is managing the money actually received, the use by taxpayer's appraiser of PGI in his analysis is immaterial since he is consistent in the use of the term throughout his analysis, and the difference in the amounts is minimal. Appraisal of Real Estate, supra, at 492.

 So. Burlington Cty., N.A.A.C.P. v. Mt. Laurel Tp , 67 N.J. 151, 336 A.2d 713 (1975) (Mt. Laurel I) and 92 N.J. 158, 456 A.2d 390 (1983) (Mt. Laurel II) providing for constitutionally mandated affordable housing.

 See St. Luke's Village, Inc., supra, 11 N.J.Tax at 83-84, in which Judge Lasser used a 4.50% pre-tax capitalization rate, reflecting a return "of and on" the investment lower than the market, in valuing senior-citizen apartment housing affordable to persons of low and moderate income operated by a non-profit corporation, and Supervisor of Assessments of Baltimore City v. Har Sinai West Corporation, 95 Md.App. 631, 622 A.2d 786, 795 (1992), in which the Court of Special Appeals affirmed the Maryland Tax Court's acceptance of an income approach using actual income, actual expenses, and a lower capitalization rate, considering the security of the come stream, in valuing a low income, high-rise apartment building for the elderly and handicapped constructed and operated by a non-profit corporation with HUD financing and tenant rental subsidies.

For the 1997 tax year, Assessment $2,750,000 = 86.70%
FMV $3,175,563
For the 1998 tax year, Assessment $2,750,000 = 88.9%
FMV
$3,091,224