**NOT FOR PUBLICATION WITHOUT APPROVAL OF**
**THE TAX COURT COMMITTEE ON OPINIONS**

**TAX COURT OF NEW JERSEY**



MALA SUNDAR
PRESIDING JUDGE

Richard J. Hughes Justice Complex
P.O. Box 975
Trenton, New Jersey 08625-0975
609 815-2922, Ext. 54630 Fax 609 376-3018

December 14, 2021

Amber N. Heinze, Esq.
Irwin & Heinze, P.A.
Attorney for Plaintiff

Gregory J. Haley, Esq.
DeCotiis, Fitzpatrick, Cole & Giblin, LLP
Attorney for Defendant

> Re:   Carteret Holdings Urban Renewal, LLC v. Carteret Borough
>       Block 7402, Lot 4
>       Docket Nos. 004485-2018; 002718-2019

Dear Counsel:

This opinion decides whether the local property tax assessment for the above referenced property (Subject) should be increased from $8,775,000 to $12,000,000, which is opined to be its true value by defendant's (Borough) real estate appraiser for each tax year 2018 and 2019, based on an income and sales comparison approach, with heaviest weight to the former.[1]

The primary issue is whether the Borough's appraiser's use of the Subject's income and expense (I&E) statement as of December 31, 2018, to conclude a value opinion for both tax years is reasonable. Plaintiff contends the appraiser should have analyzed comparable rents and operating expenses from the market for either tax year instead of using only the December 2018 I&E information which reported higher rental income and lower operating expenses than in 2017. The Borough argues that its appraiser correctly used the 2018 income because the government allowed plaintiff to charge higher rents as of August 1, 2017, for the ninety Section 8 units in the

---

[1] Plaintiff withdrew its appeals challenging the assessment for each tax year at issue. The Borough proceeded with its counterclaims. Its evidence was testimony and a report of its real estate appraiser, which was subject to plaintiff's cross-examination.

Subject, and that the appraiser reasonably disregarded the 2017 I&E statement since the expenses for repairs and maintenance (R&M) were unusually large as compared to those expenses in 2018 ($310,972.62 versus $175,395).

For the reasons following, the court finds that the appraiser's choice to use the Subject's rental income reported on the 2018 I&E statement is reasonable. However, his decision to reject the 2017 operating expenses without attempting to stabilize the R&M expenses for the tax years at issue is not credible, as was his assumption that the R&M expenses includes a provision for reserves, a normally accepted operating expense in an income-producing property such as the Subject. Since the court was not provided any data to determine the reasonable range of R&M expenses, or an appropriate provision for reserves, it cannot conclude the Subject's net operating income under the income approach for either tax year. Therefore, the Borough has failed to persuade the court that the assessments for either tax year should be increased.

**SUBJECT DESCRIPTION**

The Subject is a 5.166-acre lot improved by a circa 1969 garden-style apartment complex comprising of ten, two-story buildings. It is in the Residential Multi-family (R-M) zone and is located amongst a mix of multi-family apartments, some 1-4 family dwellings, and industrial buildings. All 101 units are rented except one which is used as an office. Of the 100 units, ninety are Section 8 units (19 one-bed; 46 two-bed; 25 three-bed) and ten are conventional (non-section 8) units (one one-bed; 3 two-beds; 6 three-beds).

Each unit is provided two surface parking spaces. There are visitor parking spots also. The complex has a coin-operated laundromat which tenants pay to use. Per the Borough's appraiser, individual apartments range from good to average condition, and the interior and exterior of the Subject is in average condition. The appraiser's report also noted that tenants pay for heat, electric,

and additional window air conditioning units, while the landlord provides water, sewer, garbage removal, and through-wall air conditioning units.

The Subject is a Section 8 project which provides subsidized housing for eligible tenants as determined by the United States Department of Housing and Urban Development (HUD). See 42 U.S.C. §1437f. It receives housing assistance payments under a housing assistance payment (HAP) contract with HUD, which is administered by the New Jersey Housing and Mortgage Finance Agency (NJHNFA). A portion of the rent is paid by the assisted (low income) tenant and the remaining by HUD. Per the appraiser, the leases were short-term.

On August 1, 2017, plaintiff executed a renewal HAP contract for a 20-year term. The NJHMFA determines the "contract" rent for the units (a unit's "total monthly rent . . . including the tenant rent" which is the "portion . . . paid by the assisted family"). See also 42 U.S.C. §1437f(c)(3) ("amount of monthly assistance payment . . . shall be the difference between the maximum monthly rent which the contract provides that the owner is to receive for the unit and the rent the family is required to pay under" the HUD law). The rents are revised (up or down) to comparable market rents every five years and once during the five-year period.[2] See also 42 U.S.C. §1437f(c)(2)(A) ("The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents . . . to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units"). Annual adjustments to the contract rent are also permitted based on changes to operating cost or project budget but will

---

[2] A five-year rent adjustment is called a "fifth year comparability adjustment," while one made during the five-year period is called a "mid-term comparability adjustment." In either scenario, the "contract rent for each unit size is set [by the NJHMFA] at comparable rent as shown by comparability analysis." See also 42 U.S.C. §1437f(c)(1)(A); (B) (HUD to establish "fair market rental . . . periodically but not less than annually for" for all types of rental units "in the market area suitable for occupancy by persons" receiving HUD housing assistance).

not result in a decrease to the contract rent. See also 42 U.S.C. §1437f(c)(2)(B) (contract to provide for "additional adjustments" as needed to "reflect increases in the actual and necessary expenses of owning and maintaining the units which have resulted from substantial general increases in real property taxes, utility rates, or similar costs").

The contract rents for the Subject are deemed to be "post-rehabilitation," which is defined to include capital repairs made to the units and are effective August 1, 2017 (although repairs can be commenced 30 days after this date and completed within a year thereafter unless extended). Repairs, proposed by plaintiff's "scope of work," must be performed in compliance with all laws. If capital repairs are not made, then the contract rents are termed as "pre-rehabilitation," and are $100 lower per unit type than the post-rehabilitation rents. A utility allowance is provided either way. Thus:

| Units | Monthly Post-Rehab Rent | Monthly Pre-Rehab Rent | Utility Allowance |
|---|---|---|---|
| 19 one-bed | $1,260 x 19 = $23,940 | $1,160 x 19 = $22,040 | $ 81 x19 = $1,539 |
| 46 two-bed | $1,630 x 46 = $74,980 | $1,530 x 46 = $70,380 | $124 x 46 = $5,704 |
| 25 three-bed | $1,830 x 25 = $45,750 | $1,730 v 25 = $43,250 | $130 x 25 = $3,250 |
| NET MONTHLY[3] | $144,670 | $135,670 | $10,493 |
| NET ANNUAL | $144,670x12 = $1,736,040 | $135,670x12= $1,628,040 | |
| GROSS MONTHLY | $144,670+$10,493=$155,163 | $135,670+$10,493=$146,163 | |
| GROSS ANNUAL | $155,163x12 = $1,861,856 | $146,163x12 = $1,753,956 | |

Plaintiff's I&E statement as of December 31, 2017, shows the potential gross income (PGR) for all units (i.e., including the ten conventional apartments) as $1,714,517 ($1,727,717 less $13,200 for "non-revenue" unit, i.e., office). No rent roll was included showing rents from the Section 8 units. Operating expenses totaled $747,413.25 (less real estate tax and debt service).[4]

---

[3] Net monthly is exclusive of utility allowance, while Gross Monthly includes such allowance.
[4] The expense categories were marketing; administrative; telecommunications; management fees; electricity; water and sewer; gas; professional and legal; payroll; audit and taxes; R&M; laundry; extermination; grounds; and garbage. R&M was $310,972.62.

4

The I&E statement as of December 31, 2018, shows the PGR for all units as $1,897,451 ($1,910,651 less $13,200 for rent attributed to office). The rent roll for December 2018 shows each unit's lease rents and amounts billed (due to utility adjustments). Included was a column "Market+Addl." which reflected the Section 8 units rents $1,280 (one-bed); $1,656 (two-bed); and $1,859 (three-bed) during 2018. The lease rent column showed the same amount but split between the resident and subsidy. The non-section 8 units were leased at varying rates, which per the summary averaged at $1,230 (one-bed); $1,078 (two-bed); and $1,205.33 (three-bed). $1,100 was attributed to the office. The total monthly lease rent for the 100 units was $160,568 (and reflected as the PGR in the summary portion of the rent roll), whereas the total of the "Market+Addl." was slightly lower at $159,768. The total billed was $159,468 (with utility adjustments). The summary breaks this down as $5,708 ("housing"); $32,583 ("resident" rent); $121,197 ("subsidy" rent of which $1,351 is utility reimbursement). Operating expenses totaled $656,364 (exclusive of real estate tax and debt service).[5]

**THE BOROUGH'S VALUE CONCLUSION**

The Borough's appraiser (accepted as an expert in real estate appraisal by the court with no objection by plaintiff) used the income and sales comparison approach as valuation techniques. Under the income approach, he used the rental income reported by plaintiff on its 2018 I&E (but noting that the monthly rental income as of September 30, 2018, was $159,138, which annualized was $1,909,656). He used all other the amounts reported on the I&E (other income, deductions for vacancies, bad debt, non-revenue unit used as office, and operating expenses except for real estate taxes and debt service totaling $670,770) in arriving at a net operating income (NOI) of

---

[5] The expense categories were the same as in 2017. See n.4. For 2018, the R&M expense was $175,395.

$1,243,902. Using the band-of-investment method, he applied a capitalization (Cap) rate of 6.75%, which he loaded with the effective tax rate for tax year 2018 ($2.929), for an overall Cap rate of 9.678%. This provided a value of $12,850,000 (rounded) which he concluded was the value for both tax years 2018 and 2019. The effective tax rate for tax year 2019 was $2.889 ($3.001 x 2019 equalization ratio of 96.27%), which provides an overall Cap rate of 9.639% (6.75%+2.889). This would provide a value of $12,809,893 ($1,243,901 NOI ÷ .09639).

Under the comparable sales approach, the appraiser used six sales of apartment complexes with the number of units ranging from 26 to 68; sale dates ranging from April 2017 to February 2019; and sale prices ranging from $2,625,000 to $8,500,000. He adjusted the sale prices for location, number of units, garages/parking, and quality at 5% each (positive or negative). Using a per apartment unit of measurement, he concluded a value of $108,000 which times the Subject's rented units (100) totaled $10,800,000.

He placed most emphasis on the income approach, the Subject being an investment/income producing property. He thus concluded a value of $12,000,000 for each tax year. He testified that absent the sales comparison approach, his value conclusion would be $12,850,000 each tax year.

**ANALYSIS**

*Presumption of the Assessments' Correctness*

A counterclaimant carries a dual burden of first overcoming an assessment's presumptive correctness, and thereafter, of persuading the court of the correct value of the property. MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373, 377-78 (Tax 1998); Ford Motor Co. v. Twp. of Edison, 127 N.J. 290, 314-15 (1992), aff'g, 10 N.J. Tax 153 (Tax 1988). The court can only determine the true value of the property based upon "the evidence before it and

the data that are properly at its disposal." F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 430 (1985).

The Borough's appraiser's value opinion was primarily based on the income approach, an accepted valuation methodology for apartments. As such, his value conclusion raises a debatable question whether the imposed assessments are accurate. Therefore, the court finds that the Borough has overcome the initial presumptive correctness of the assessments. It will now examine the proffered evidence and whether it suffices to change the imposed assessments.

*Subject's Highest and Best Use (HBU)*

"The [HBU] analysis requires sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. Twp. of South Hackensack, 27 N.J. Tax 255, 268 (Tax 2013) (citations omitted), aff'd, 28 N.J. Tax 337 (App. Div. 2015). "Actual use is a strong consideration" when analyzing the HBU "of an improved property." Ibid. (citation omitted).

The Borough's appraiser concluded the Subject's HBU as improved was its current use for the tax years at issue. Plaintiff did not dispute this conclusion. Although ten units of the 100 units are conventional, there was no proof that converting the Subject to unrestricted apartment complex or any other type of multi-residential housing or improvement permitted by the zoning laws or any other alternate, would meet the HBU tests. The court agrees with the Borough's appraiser's HBU conclusion for the Subject since it meets all four criteria of the HBU analysis.

*Subject's Valuation*

Initially, the court rejects the sales comparison approach as a credible value indicator of the Subject. The appraiser conceded that none of the sold complexes was rent controlled under a

7

HUD contract like the Subject. See e.g. Schwam v. Twp. of Cedar Grove, 9 N.J. Tax 406, 413 (Tax 1987) ("No conclusion with respect to the effect on market value of senior occupancy can be drawn from the eight comparable sales, as the proofs reveal that seven of the comparable properties were not occupied by seniors at the time of sale"), aff'd, 228 N.J. Super. 522 (App. Div. 1988); Romulus Dev. Corp. v. Twp. of Weehawken, 15 N.J. Tax 209 (App. Div. 1995) (affirming the Tax Court's opinion, which among others, rejected a negative adjustment for affordable housing since "an affordable housing requirement . . . inescapably impacts the price paid by the developer-purchaser" therefore, the deduction in the valuation process would be "double counting").

The appraiser was also unaware whether the Subject's sale would require HUD/NJHMFA approval, conditions, or control. If there are any such limitations, then the sale price would be dictated by such restrictions. See e.g. Prowitz v. Village of Ridgefield Park, 237 N.J. Super. 435, 439, 443 (App. Div. 1989) (where the value of a unit "is substantially affected by their maximum resale price under the deed restriction" pursuant to the affordable housing laws, its "assessment relevance" cannot be ignored since the deed restriction is "analogous to value-depreciating government regulation"). In any event, the appraiser placed very little weight to this approach. Therefore, the court will not analyze its merits.

The income approach is an acceptable valuation method since the parties agree that the Subject is income producing and therefore, a viable investment property to a potential buyer. Under this approach, an appraiser should: (1) determine the potential gross income for the GBA; (2) reduce the same by a market-based vacancy and collection loss provision, which will then provide the EGI; (3) deduct from EGI certain operating expenses (excluding real property tax); and (4) capitalize the resulting NOI by a Cap rate. For a tenanted property such as an apartment complex, the effective tax rate is added to the Cap rate. See Jefferson House Invest. Co. v. Borough

8

of Chatham, 4 N.J. Tax 669, 677 (Tax 1982) ("[t]he actual taxes assessed are reflected in the income approach by including the effective tax rate" in the Cap rate).

Here, the Borough's appraiser's income approach presents two primary issues: (1) whether the Subject's actual rents should be tested with market rents before being used; and (2) whether the appraiser was reasonable in using only the information on the 2018 I&E statement for both tax years at issue.

In analyzing rents of a *restricted apartment complex*, this court has held that governmental restrictions must be considered when determining that property's PGR.  See e.g. Schwam, 9 N.J. Tax at 413 ("protected senior tenancies . . . like zoning and other governmental restraints upon the rights associated with real property ownership . . . have an impact upon market value"); Borough of Little Ferry v. Vecchiotti, 7 N.J. Tax 389, 411 (Tax 1985) ("[i]n rent control communities it is the ordinance itself that establishes the market").  As to a Section 8 project, this court has held that when that property's HBU as improved is for its continued use as subsidized housing under governmental rent controls, then the rents allowed under the governmental contract controls.  See Penns Grove Gardens, Ltd. v. Borough of Penns Grove, 18 N.J. Tax 253, 264 (Tax 1999) (the Section 8 apartment complex's HBU being "for subsidized, rather than conventional, apartment housing," the court "need not deal with the issues involving the difference between contract and market rent").[6]  The court cited to numerous out-of-State cases which addressed valuation of "federally subsidized housing projects" with the majority view being that the impact of rental subsidies cannot be ignored.  Id. at 258, n.1.  See also Maricopa Cty. v. Viola, 490 P.3d 385, 390,

---

[6] The appraisers for both taxpayer and the taxing district had agreed that "the contract rent actually paid by" a tenant was the "same as the economic or market rent in the area."  Penns Grove Gardens, 18 N.J. Tax at 264 (internal quotation marks omitted).  Therefore, the court held, it was "not valuing a leasehold interest."  Ibid.  The court then used the governmental contract rents (plus utility reimbursements) as of the assessment date at issue, as the property's PGR.  Ibid.

and n.3 (Ariz. Ct. of App. 2021) (dealing with federal low-income housing tax credits and holding that it joins the "majority of jurisdictions that have decided this issue and similarly allowed or required the consideration of rental restrictions on low-income housing projects in property tax valuations").

Plaintiff argues that regardless, low-income housing rents must be tested with the market, and having not done so, the Borough failed to overcome the presumptive correctness of the Subject's assessments. It cites to First Real Estate Inv. Trust of New Jersey v. Borough of Hasbrouck Heights, 190 N.J. Super. 85, 88 (App. Div. 1983), which reversed the Tax Court's decision that since the property was rent controlled, the contract rent can be used for valuation since "a search for economic or fair market rentals would be futile." The higher court noted that the court and the taxpayer's appraiser had "failed to recognize the fact that a major consideration in estimating a gross income projection involves rental comparisons." Id. at 89 (citation and internal quotation marks omitted). Thus, adopting the property's actual rents as economic rents, without more, was an inexcusable "shortcut[]," and the "the focus must be on the value of the property in the market place, without regard to the particular or peculiar circumstances of the owner." Id. at 91 (citation and internal quotation marks omitted).

However, as explained by this court, while the Appellate Division "suggested that rents" in rent-controlled apartments "should be compared with those charged in comparable properties," one cannot ignore "the reality of the matter . . . that the purchase price paid by a prudent investor will be based on the income permitted by ordinance." Borough of Little Ferry, 7 N.J. Tax at 410. Thus, the court agreed with the "appraisal fraternity" that an "attempt to compare the rents of one property with those charged by another is a futile exercise because whether the comparable rents are higher or lower the rents under review cannot be adjusted except within the parameters allowed

10

by the ordinance." Ibid. The court held that the ordinance which imposes rent controls, "sets the market." Id. at 411. "Because of the artificially imposed ceilings a requirement that such a search be conducted would result in added time and expense to both the bench and bar with a probable chilling effect on tax appeals." Ibid.

Nonetheless, the court held, "it would be erroneous, simply because rents are subject to controls, to blindly accept the actual rents as market rents." Ibid. As explained by Judge Evers, "[a]lthough a complex may be well managed . . . other factors such as the tax benefits which accrue to an owner may nevertheless encourage that owner to retard the rents." Ibid. For instance, if the subject property's actual rents were higher than rents of other rent-controlled properties under the same ordinance, but lower than the rents "permitted by the ordinance," and there was no evidence that lower rents reduced vacancies, then use of the maximum allowable rents, i.e., "rents which would be charged by the prudent, hypothetical purchaser," as the PGR is proper. Id. at 411-12.

In the context of analyzing rents of an *unrestricted apartment complex*, our Supreme Court has held that absent "convincing evidence to the contrary, the current ongoing income scale of a large, well-managed apartment project . . . functioning as customary with leases of relatively short length, should be deemed prima facie to represent its fair rental value for purposes of the capitalized income method of property valuation." Parkview Village Associates v. Twp. of Collingswood, 62 N.J. 21, 34-35 (1972). This is because "landlords of well-managed apartment complexes [will] maximize their profits and minimize their expenses." Ibid. Thus, for instance, it is improper to "disregard[] the presumption that actual rent equals economic rent in a well-managed apartment complex." Glen Wall Assocs. v. Twp. of Wall, 99 N.J. 265, 276 (1985). The presumption can be overcome if it is proven that "(1) the . . . property is not well managed, (2) the leases are . . . old, long term leases, or (3) . . . a comparison with at least four comparable

11

apartment properties" shows the leases are not at market.  Parkway Village Apts. Co. v. Twp. of Cranford, 108 N.J. 266, 272-73 (1987), rev'g on other grounds, 8 N.J. Tax 430, 441-42 (Tax 1985). For instance, proof that a property owner "is not maximizing his rents or is favoring long-term tenants" can destroy the presumption.  Ibid.

Here, plaintiff did not proffer any alternate HBU for the Subject.  The court also agreed with the Borough's appraiser that the Subject's HBU as improved is its current use, i.e., as Section 8 affordable housing project.  As in Penns Grove Gardens, Ltd., here also "as of the relevant valuation dates and into the foreseeable future, the subject property was, is, and will be actually used as subsidized apartment housing," id. at 259, given its 20-year term commencing August 1, 2017.  Therefore, the Borough's appraiser's lack of analysis of rents from unrestricted apartment complexes is not per se improper.  Nor is it necessarily fatal that the appraiser did not consider the rents of other Section 8 housing projects as evident by the precedent set forth above on valuation of rent-controlled properties (but such analysis if undertaken, would not necessarily be rejected).

Thus, it is proper to use rents set by the HAP contract effective August 1, 2017, to compute the Subject's PGR for both tax years (plus utility reimbursements as they are part of the PGR). The assessment date for tax year 2018 is only two months after the rent effective date of August 1, 2017 (for this reason also, the rental income information in the 2017 I&E which would include amounts starting January 1, 2017, need not be considered).  While the rent effective date is a year after the assessment date for tax year 2019, the HAP contract rents are still usable since rents adjustments are once in five years; there was no proof that an adjustment was sought by plaintiff,

12

or made by the NJHMFA, to any Section 8 unit's rent in 2018;[7] and the Subject's HBU as of that assessment date, as improved is for its current use as subsidized housing.

As to the ten non-Section 8 units in the Subject, it is doubtful whether the Parkview presumption even applies. That presumption applies to the entire complex, not to units within a complex. Here, 90% of the Subject is comprised of Section 8 units. Therefore, it would be more appropriate to consider the controlling law as set forth in Penns Grove Gardens vis-à-vis the Subject, which then would not require a separate analysis as to whether the actual rents for the ten units are at market.

Even if the Parkview presumption applies, the Borough's appraiser agreed that the Subject was well-managed, especially since it was subject to governmental controls in terms of periodic inspections as to the condition and safety of the premises. He stated that the leases were of relatively short term (up to one year), and that the Subject was 100% occupied in 2018, with a waitlist for future tenancies. Nor was there anything to show that tenant turnover was high resulting in large vacancies in 2017 (the 2017 I&E statement used a lower vacancy allowance than in 2018). Therefore, in accepting the 2018 I&E statement for rental income, the Borough's appraiser implicitly agreed that the actual rents for the ten unrestricted units was their economic rent. Plaintiff's questioning the appraiser's failure to do a comparable rent analysis (but broadly, as to all the units in the Subject) is not convincing evidence for the court to invalidate the Borough's appraiser's adoption of the Subject's actual rental for 2018. Cf. Parkway Village Apts. Co., 108 N.J. at 276 (just because "an apartment in a specific category is rented at a higher rent

---

[7] Per the HAP contract, any rent adjustment requires NJHMFA to notify plaintiff with a "revised" exhibit "that specifies the adjusted contract rent amounts," which notice should also "specify" the effective date of the adjustment.

than the other apartments in that category is not sufficient evidence, by itself, to overcome the Parkview presumption" and actual rents can be considered economic rents).

In sum, the court finds that the Borough's appraiser's use of the rental income reported on plaintiff's 2018 I&E statement as the Subject's PGR is not unreasonable. The court need not decide whether the reported PGR is the maximum allowable rents for the Section 8 units (pre-or post-rehabilitation), and the balance attributable to the conventional units,[8] because, as explained below, it cannot agree with the appraiser's use of only the 2018 expenses.

Unlike rents, the operating expenses of/for a Section 8 project is not subject to any governmental control. Indeed, per the HAP contract, it is plaintiff's obligation to maintain the Subject in a safe, habitable, and well-maintained condition with the government having the right to conduct periodic inspections in this regard. Even the Borough's post-trial brief notes out that plaintiff "is limited to only accepting a contractually-set maximum amount of rent for housing units" under an HAP contract.

Therefore, as with unrestricted apartments, the actual operating expenses need not be disregarded unless it is objectively proven that they are unreasonable. See e.g. Parkway Village Apts. Co., 8 N.J. Tax at 443-44 (accepting the taxing district's provision for R&M expenses at a stabilized percentage of EGI based on an analysis of the prior three years I&E statements when the R&M expense for the immediate past two years appeared unreasonably high);[9] Penns Grove Gardens, 18 N.J. Tax at 266-65 ("it is appropriate to stabilize expenses," and finding that taxpayer's appraiser's provision based on "a historical expense analysis" of the property's

---

[8] There was no substantive or any objection from plaintiff as to the Borough's appraiser's acceptance of plaintiff's deductions from rent for (1) rent attributed to office space; and (2) vacancy/debt collection, and additions to PGR due to other income.

[9] The court's ruling was reversed only as to its findings of economic rent. See 108 N.J. at 276.

expenses for five years and "stabilized expenses consistent with the market" is more credible than the taxing district's appraiser's use of the "actual expenses" from the I&E statement "which were higher" and lacked "any analysis").

"[A]n appraiser's function is to reconstruct a yearly pattern of expenses" because they "vary" each year, thus, "it is important to review operating statements for three or more years in order to determine whether certain expenses are typical or atypical," which stabilized expense will also "reflect[] the patterned expense to be anticipated by the potential purchaser." Parkway Village Apts. Co., 8 N.J. Tax at 444 (citations omitted). See also Brunetti v. City of Clifton, 7 N.J. Tax 161, 176 (Tax 1984) ("An appraiser . . . is required to review, reanalyze and investigate where expenses on the surface appear unreasonable" because "a prospective purchaser would want to know the actual expenses in order to formulate his own standardization where particular expenses in a given year appear to be other than ordinary"); Equitable Life Assur. Soc. of U.S. v. Twp. of Secaucus, 16 N.J. Tax 463, 467 (App. Div. 1996) (if "expenses [are] . . . unusually high, an adjustment must be made to fit the 'well-managed' standard").

No such corroboration was attempted by the Borough's appraiser as to the R&M expense, the only reason he claimed to have rejected the 2017 I&E statement. No objective data was provided to the court, such as for instance, operating expenses for Section 8 projects or other subsidized housing, or even for unrestricted apartments. See e.g. Penns Grove Gardens, 18 N.J. Tax at 262 (noting that the Institute of Real Estate Management (IREM) provides I&E analysis for "federally-assisted apartments and one for conventional apartments"). No evidence was offered to show that the appraiser perused the I&E statements of prior years or even of year 2019 to conclude that the 2018 R&M expense was more typical. It may be that the R&M expense was low for 2018 but was higher for 2019. It maybe that the R&M expense was higher in 2017 but even

15

more so in 2016. There was no listing of the items comprised in the R&M category. In other words, the court is unpersuaded, without more, that the R&M expense for 2018 is typical, while that for 2017 is atypical.

Further, neither of the I&E statements (2017 or 2018) made any provision for reserves. Reserves for replacement "provides for the periodic replacement of building components that wear out more rapidly than the building itself and must be replaced during the building's economic life." Appraisal Institute, The Appraisal of Real Estate, 485 (14th ed. 2013). While the items comprising the reserves "is a matter of appraisal judgment based on market evidence," the "magnitude and coverage of the replacement allowance is based on the annual [R&M] expenses of the property for the specific components considered in the allowance." Id. at 486.

When questioned about this, the appraiser stated that reserves were included in the R&M. However, there was simply no data to support this assertion. As noted above, the court was not educated on what items were comprised in the R&M category, and what items therein should have been re-categorized as a capital expense, thus, proving that a portion of the R&M amount should be included as reserves. If per the appraiser, plaintiff's R&M expenditure includes reserves, then it would be unreasonable to reject the R&M amount on the 2017 I&E and conversely not increase the 2018 expenses with a provision for reserves. In any event, without any details of the expenses in R&M category on the I&E statement (2017 or 2018), the court is unpersuaded that the R&M expense on the I&E statements included reserves. Nor can it, without any supporting data, conclude which year's R&M expense is typical or atypical, and what is a reasonable allowance for Section 8 projects for this category, and for reserves.

The Borough argues that that because its appraiser used the higher rental income for 2018, there is a presumption "that capital and/or rehabilitation repairs were made in 2017 upon renewal

16

of the" HAP contract. Other than being unsubstantiated, such presumption does not solve the lack of breakdown of the R&M expense on the I&E statements or provision for reserves. Indeed, if the alleged capital repairs were recaptured as higher rents, then it would require the court to deny any allowance for R&M as an operating expense (since plaintiff, as the landlord, has passed this expense to the government, similar to the landlord passing expenses to a tenant under a net lease).

The Borough notes that even if its appraiser's rejection of the 2017 expenses was improper, this court can find value based on its use of actual operating expenses in its recent unreported decision.[10] However this does not solve the problem raised by the absence of a provision for reserves. In contrast to the instant matters, in the unreported case, plaintiff's appraiser provided an itemization of the expenses comprised in the R&M, and his analysis of its reasonableness, and data from IREM and other sources were provided both for R&M and reserves. Based on this evidence, the court was able to conclude a stabilized allowance for R&M, as well as for reserves.

**CONCLUSION**

For the foregoing reasons, the court finds that the Borough failed its burden in proving by a preponderance of the evidence, that the assessment for tax years 2018 and 2019 should be increased to $12,850,000. Therefore, the assessments are affirmed. The court will enter judgments accordingly.

_/s/ Mala Sundar_
Hon. Mala Sundar P.J.T.C.

---

[10] The unreported case was <u>Spring Terrace Apartments, LLC v. Borough of Freehold</u>, Docket Nos. 001548-2017; 002029-2019; 003045-2020 (Tax June 17, 2021).